**Loyd A. SIMON and Angela A. Simon, et. al, Plaintiff,**

v.

**UNITED STATES of America, United States Postal Service, Defendant.**

No. 97–CV–2076.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

March 8, 1999.

Robert W. Thomas, Thomas & Hardy, Lake Charles, LA, for plaintiffs.

Sabrina Skeldon, U.S. Atty's Office, Shreveport, LA, for U.S. and U.S. Postal Office, defendants.

## OPINION

TRIMBLE, District Judge.

This matter was tried before the undersigned on December 3, 1998 and December 4, 1998 in Lake Charles, Louisiana. This suit arises out of an automobile collision between a vehicle operated by the United States Postal Service ("Postal Service") and a private citizen. Plaintiff, Angela Simon ("Simon"), sued the United States Postal service under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* Mrs. Simon seeks to recover damages for personal injuries and property damage. This court's jurisdiction and venue are based upon 28 U.S.C. § 1402(b) and 28 U.S.C. § 1346(b), respectively.

### I. PROCEDURAL BACKGROUND

The accident that forms the basis of this action occurred on October 30, 1996. Between November 26, 1996 and August 19, 1997, Angela Simon and her husband, Loyd, filed administrative claims for recovery of property damage to their vehicle and personal injuries to Mrs. Simon. These claims were rejected and plaintiffs subsequently filed suit in this court. When suit was filed, Mr. Simon asserted claims individually and on behalf of the couple's two minor children. These claims had not been presented as administrative claims. Accordingly, this court granted summary judgment in favor of the United

States and dismissed those claims, as plaintiffs failed to properly exhaust their administrative remedies pursuant to the Federal Tort Claims Act.[1] The claims before the court during the trial of this matter were those of Mrs. Simon for personal injury and property damage.

## II. SUMMARY OF EVIDENCE

On October 30, 1996, Kathy Wilson ("Wilson"), an employee of the Postal Service, was in the process of delivering mail on her route in Vinton, Louisiana. As part of her route, Wilson traveled to 1300 Center Street, a trailer park. Wilson parked her postal vehicle, called a "long-life vehicle" or "LLV," and proceeded to deposit the mail in the four neighborhood delivery collection box units that serviced the residents of the trailer park.

Angela Simon testified that she resided in a trailer west of the parking lot. That morning, she had left her mother-in-law's to check the mail. She approached the lot traveling east on Center Street and pulled in, parking even with the LLV on the west side of the vehicle. Simon stated that she returned to her car after receiving her mail and backed out to proceed west in the westbound lane.

Testimony revealed that Simon arrived while this process was underway and Wilson stated that she went ahead and provided Simon's mail to her. Simon disputes this and claims that she obtained her mail from her box. Once Wilson completed her tasks, she departed the parking lot. Wilson testified that it took between ten and twelve minutes to complete her duties at that location.

The parking lot at issue sits to the west of the southwest corner of the intersection of Center and West streets. The parking lot is entered on the south side of Center Street and measures approximately thirty-three by forty feet. Wilson testified that she entered the lot as usual that day and normally backs out in a northwesterly direction, enabling her to see from her left onto the road, in order for her to enter the roadway. While backing up, Wilson stated that she looked to her right (west), which would have been the direction of on-coming traffic.

The vehicle driven by Wilson is now the standard delivery vehicle used by the postal service. The LLV is a fifteen foot vehicle resembling a van mounted on a one-half ton chassis. The driver sits on the right hand side of the passenger compartment, which contains only one seat. The only way to enter and exit the vehicle is from the right hand side. The driver is able to see in three directions: front, right and left, via the windows. The rear view, however, is obscured and the driver is forced to rely upon the intricate configuration of mirrors on the LLV. These mirrors enable the driver to see the area in front of the vehicle obscured below the hood and along both sides. Additionally, these mirrors are used to see behind the vehicle. The testimony adduced at trial revealed that the range of visibility with the rear facing mirrors is approximately eight to ten feet. Simon was driving a 1991 white four door Pontiac Sunbird.

Wilson testified that she never saw Simon's vehicle until after the incident. She stated that she did not see anything when checking her mirrors. Wilson admitted, however, that she did not perform a "walkaround" of the vehicle before departing. Wilson stated that she assumed that Simon had already left the area. Wilson testified that she was traveling at a speed of approximately three miles per hour in reverse when the accident occurred. The left rear bumper of the LLV came in contact with the driver's side door panel of Simon's vehicle. It is uncontroverted that the collision left no skid marks in the road. Simon testified that her vehicle was not moved by the force of contact. The photographs of the "damage," a barely distin-

---

1. *See* Memorandum Ruling and attached order dated October 7, 1996.

guishable dent in the left front door, are consistent with this testimony.

Immediately after the accident, Wilson had to pull forward to allow Simon to exit her vehicle. According to Wilson, Simon was able to exit her vehicle with no difficulty. Wilson stated that she asked Simon three to four times if she was injured and each time the response was "no." Simon also urged Wilson not to call the police, stating that it was her husband's car and that she had no permission to operate it. Apparently, Simon regarded the damage as minimal, telling Wilson that it was just a dent, and she could have a friend "pound it out." Wilson, however, insisted upon calling the police and left the scene to locate a telephone. While Wilson was gone, Simon moved her vehicle into the parking lot.

Officer Vice of the Vinton Police Department testified that he responded to the accident and found that there were no eyewitnesses other than Simon and Wilson. Officer Vice stated that Simon and Wilson told him, contrary to the sworn testimony of Simon, that the Simon vehicle was in the eastbound lane headed west at the time of the accident. Officer Vice also stated that Simon told him her fender and mirror were damaged in a prior accident. Other than issuing Simon a citation for driving without a license, Officer Vice took no other action related to the accident.

In addition to Officer Vice, Robert Benoit ("Benoit"), the postmaster in Vinton, responded to the scene. Pursuant to Postal Service policy, Wilson contacted Benoit immediately after the accident. Benoit testified that the LLV was not damaged at all. Benoit stated that the bumper on the LLV is rubberized and designed to "give" in the event of a collision. Benoit stated that Simon said she was fine and Wilson

confirmed this. Again, contrary to Simon's testimony, Benoit recalled Simon saying that she backed out of the parking lot directly behind the mail truck into the eastbound lane. Benoit testified that he did not see any gravel or shell messed up (from the parking lot) and no skidmarks were left on the road. Benoit found that Wilson failed to use proper backing rules, but did not suspend her given the minor nature of the accident and the fact that she had never been involved in any prior accidents.

Simon stated that she went home after the accident and did not feel injured. Simon testified that it was not until later in the day that she began to feel some pain in the nature of headaches and left shoulder pain. Simon did not see a doctor until two days later when she traveled to the emergency room ("ER") at W.O. Moss Regional Hospital ("Moss Regional") in Lake Charles on November 2, 1996. The notes from Simon's visit to the ER reveal that the treating physician noted complaints of pain between the shoulder blades. Simon was diagnosed with a "neck sprain/strain," fitted with a soft-collar and prescribed various medications for her pain. The ER also ordered a cervical spine x-ray that was negative. Simon was told to return in the event her pain worsened.

On November 8, 1996,[2] pursuant to a referral by the Townsley law firm, which by now represented her, Simon was seen by a physician, Dr. Lee Scwalben of Health & Medical Practice Associates in Lake Charles where said law firm had a standing account. Dr. Scwalben stated that his first examination of Simon revealed a cervical strain or sprain with mild fasciitis and a thoracic strain or sprain. For treatment, Dr. Scwalben prescribed

2. There is some discrepancy in Dr. Scwalben's testimony regarding the date he initially saw Simon. Under direct examination, Dr. Scwalben stated that her first visit was November 3, 1996. The records submitted by Plaintiff from Health & Medical Practice Associates reveal that Simon was first seen on November 8, 1996, which Dr. Scwalben admitted under cross-examination. Given the fact that the records repeatedly list November 8 as the first day she was seen, the court will treat that date as the first date of treatment by Dr. Scwalben.

sleeping pills, a steroid injection and relaphyn. Additionally, Dr. Scwalben scheduled Simon for a MRI. Between November 8, 1996 and January 17, 1997, Simon was treated some twenty times by Health & Medical Practice Associates. Dr. Scwalben testified that although Simon was treated twenty times, she was only seen by him on seven of those visits. Dr. Scwalben testified that the clinic was operated under the supervision of Dr. Maerhoffer, a chiropractor. Simon testified that both Dr. Scwalben and Dr. Maerhoffer oversaw her treatment. Over the course of her treatment by Dr. Scwalben, Simon testified that she received a chiropractic adjustment only one time. A review of the billing statement from Health & Medical Practice Associates indicates otherwise. The billing statement contains several entries stating that Simon received a "massage." Additionally, Dr. Smith testified that Simon told him she received chiropractic adjustments daily. Simon incurred some $5,034 in expenses from her treatment by Health & Medial Practice Associates from November 8, 1996 to December 30, 1996. From the initial treatment, all expenses were referred to and paid by the Townsley law firm. Simon's last visit to Dr. Scwalben was on January 17, 1997. On that date, Dr. Scwalben referred Simon to Dr. Bernauer, who is a board certified orthopedic surgeon.

Prior to her last visit to Dr. Scwalben, Simon had an MRI on January 10, 1997. Dr. Scwalben testified that the MRI revealed a central disc bulge at C5–C6. The notes of the radiologist state findings that the spinal canal was adequate, there was no impingement on the root nerves and no soft tissue trauma. Simon brought the MRI results to Dr. Bernauer.

Dr. Bernauer testified that Simon was referred to him by Dr. Scwalben and he first saw her on February 17, 1997. As part of the referral, Dr. Bernauer received a letter and $500 check from the Townsley law firm. Dr. Bernauer ordered an MRI and cervical myelogram and both were performed in August 1997.[3] Dr. Bernauer stated that the MRI revealed a central disc bulge at C5–C6 and showed some "compression." Dr. Bernauer also stated that the cervical myelogram produced findings identical to those from the MRI. On August 18, 1997, an EMG was performed by the physician at Moss Regional and revealed left C5–C6 radiculopathy. Dr. Bernauer stated that, in his opinion, Simon would only be able to cope with the pain she was experiencing by lying down.[4]

On December 4, 1997, Dr. Bernauer performed an anterior cervical discectomy infusion and stated that the surgery revealed a ruptured disc. Immediately following surgery, Simon's left arm pain subsided and her other symptoms improved. Dr. Bernauer was of the opinion that the accident on October 30 caused Simon's injuries. Under cross-examination Dr. Bernauer stated that the ruptured disc could have resulted from a pre-existing condition. Dr. Bernauer also admitted seeing the patient three times before operating on her. Dr. Bernauer admitted that a chiropractor could have caused a herniated disc in the course of making adjustments to the patient's spine.

Dr. Donald Smith, a board certified neurologist, testified for the government. Dr. Smith took issue both with the nature and extent of Simon's injuries. Dr. Smith discussed findings from radiographic studies performed on Simon prior to her surgery. He found that the result of those studies suggested findings consistent with persons in the general population that had not experienced trauma or injury. Dr. Smith

---

**3.** These films were never produced by the Plaintiffs. Counsel explained that the films were "missing" and neither party was able to locate a copy. Dr. Smith was unable to review copies of these films and was forced to rely on the radiologist's notes.

**4.** Interestingly, under direct examination, Simon testified that following the accident, she was forced to sleep sitting up.

performed a Rule 35 examination on Simon. Discussing the exam, Dr. Smith recalled that Simon mentioned having a chiropractic manipulation daily before her physical therapy while under the care of Dr. Scwalben.

Dr. Smith also discussed his opinion with regard to the MRI performed on Simon on January 10, 1997. Dr. Smith noted a minimal disc bulge at C5–C6 level that failed to show any impingement on the dura or nerve roots. The radiologist's interpretive notes stated that "the spinal canal was adequate" and Dr. Smith interpreted this as meaning that no impingement on the canal appeared. Dr. Bernauer disagreed with this during his testimony, believing it to mean that the radiologist noted no bony growth into the spinal canal. Dr. Smith stated that his review of the MRI revealed no nerve root compression and the disc bulge was, in his opinion, not "significantly abnormal." In fact, Dr. Smith stated that a bulge such as the one he observed on Simon's MRI was "very common in the general population." The MRI also failed to indicate any trauma to Simon's soft tissue, some two and one-half months post-injury. With regard to the ER notes from Moss Regional, Dr. Smith characterized the findings as inconsistent with active radiculopathy and revealing nothing more than neck pain. Treatment in Moss Regional clinic on April 15, 1997, according to Dr. Smith, revealed neck pain and no symptoms consistent with active radiculopathy.

As part of his examination, Dr. Smith oversaw the performance of several tests on Simon. He stated that she was capable of performing light work with some activities in the medium range. Dr. Smith also found that certain tests were stopped for psychophysical reasons, which are based upon subjective complaints of the subject and represent certain inconsistencies. Many of the poor results on Simon's tests were, in the opinion of Dr. Smith, the result of poor conditioning. Under cross-examination, however, Dr. Smith stated that all the tests performed on Simon, including the MRI, myelogram, CT and EMG were "consistent with a disc injury or a disc problem of some type at C5–C6."

Although Simon testified that she has been pain-free since her surgery, Dr. Smith's notes reveal that she complained of pain when she was examined by him on August 17, 1997. Dr. Smith opined that something other than the accident could have caused the injury to Mrs. Simon. In particular, Dr. Smith stated that, taking the radiologist's interpretation of the myelogram and CT literally, it is quite likely that something happened in the interim. Dr. Smith also questioned the ability of the accident to result in the injuries suffered by Simon. He stated that the minimal damage, lack of skidmarks, low rate of speed and the fact that Simon was restrained by her seatbelt make it very unlikely that the wreck caused a cervical disc injury.

Over the course of her medical treatment, Simon amassed a number of medical expenses: $1425.33 at Moss Regional; $8835 to Dr. Bernauer;[5] $361.91 in prescriptions;[6] $12,976.38 at Columbia Women's and Children's Hospital; $778 in radiology expenses; $15 in pathology; $1842 to Anesthesiology Associates; and $5034 to Health & Medical Practice Associates (which was paid by the Townsley law firm). This amounts to $31,267.62. Simon, however, has not been required to pay for any of these treatments. Many were either paid for by Medicaid or her attorneys. The Louisiana Health Care Authority, according to the evidence, has notified Plaintiff that it will enforce its right of subrogation in the event of recovery pursuant to

---

**5.** The bills from Dr. Bernauer were sent directly to counsel for Mrs. Simon and it was unclear whether those bills have been paid or not.

**6.** The testimony at trial revealed that Simon paid for most of her prescriptions pursuant to an account maintained by her former attorney with a pharmacy in Lake Charles.

LA.REV.STAT. § 9:4751, *et seq.* In their post-trial memorandum, Plaintiffs have asked the court for an award of $125,000 in addition to medical expenses. Defendants assert that the evidence requires a take-nothing judgment.

### III. LAW & ANALYSIS

Several issues were raised by the parties in their respective post-trial memoranda. The court will address each in turn.

### A. Preliminary Issues

### 1. What Were the Respective Duties of the Parties?

Both parties contend that the applicable law mandates a finding that the other party was negligent. The Plaintiffs claim that Wilson, as a backing motorist, owed an "unusually high degree of care" to the motorist in the main thoroughfare, i.e., Simon. *See Schackai v. Tenneco Oil Co.,* 436 So.2d 729 (La.App. 4th Cir.), *writ denied,* 440 So.2d 759 (1983). The Plaintiffs essentially claim that the backing maneuver performed by Wilson violated the standard of care owed by a driver to other motorists. Defendants claim that drivers backing from a private driveway are not required to look out for or search for drivers whose approach violates the rules of the road, i.e. a person in the wrong lane. *See Taylor v. Chism,* 660 So.2d 145 (La. App. 2d Cir.1995).

At the outset, this court finds that Mrs. Simon was operating her vehicle on the wrong side of the road when the collision occurred. Though this determination is contrary to Simon's own testimony, the court believes it is more than adequately supported by the evidence. Wilson testified that Simon's vehicle was pointed west in the east bound lane. Officer Vice also testified that both Simon and Wilson told him that Simon's vehicle was in the east-bound lane. The diagram completed by Officer Vice on his report reflects that Simon's vehicle was in the wrong lane.

Louisiana law imposes a duty on drivers performing backing maneuvers, mandating that "[t]he driver of a vehicle shall not back the same unless such movement can be made with reasonable safety and without interfering with other traffic." LA.REV. STAT. § 32:281.A (1999). Drivers are also, however, required to remain on the proper side of the roadway. LA.REV.STAT. § 32:71.A (1999) provides that "[u]pon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway."[7]

■ The Plaintiffs rely on a large volume of case law to support their argument that the backing driver owes some higher duty to the other driver. The court differs in its interpretation of these cases. None of the cases cited by the Plaintiffs involve a situation where two drivers were backing,[8] as could be argued in this case, and, more importantly, none of those cases address the situation where one of the drivers was in the wrong lane.[9] Some of the case law cited by the Plaintiffs discuss the duty of a driver backing from a private driveway into a main thoroughfare. *See Schackai, supra, Vinet, supra,* and *Dupree, supra.* The court agrees that a driver entering a thoroughfare owes a higher degree of care to other motorists on such roadway. This

---

**7.** This law is subject to three exceptions: (1) when overtaking and passing another vehicle; (2) when the right side of the road is closed for some reasons; and, (3) on one-way roads. LA.REV.STAT. § 32:71.A(1)–(3) (1999). None of these exceptions are applicable in this matter.

**8.** Simon testified that her car was at a stop and she was in the process of shifting from reverse into drive when the collision occurred.

**9.** Indeed, two of the cases relied on by the Plaintiffs involve situations where the backing motorist collided with a pedestrian. *See Turner v. New Orleans Public Service, Inc.,* 476 So.2d 800 (La.1985); *Scully v. Gautreaux,* 514 So.2d 222 (La.App. 5th Cir.1987). Even pedestrians are held to a duty of reasonable care and the principles of comparative fault apply in automobile/pedestrian collisions. *See Endsley v. Pennington,* 718 So.2d 650 (La. App. 2d Cir.1998). Surely another motorist should be held to the same standard.

principle assumes, however, that the other motorist is operating her vehicle in a lawful manner. In *Miller v. Keal*, 694 So.2d 569, 572 (La.App. 2d Cir.), *writ denied*, 703 So.2d 620 (1997), the court explicitly limited the duty relied upon by the Plaintiffs, stating that the duty of a motorist traveling from a private drive to a main thoroughfare is owed to "favored" traffic, *citing Taylor, supra*, and *Davis v. Galilee Baptist Church*, 486 So.2d 1021 (La.App. 2d Cir.1986). Certainly a driver on the wrong side of the road is not "favored" traffic. The case most directly on point is that cited by Defendants, *Taylor*, cited *supra*. In *Taylor*, the court stated that:

> The high degree of care imposed upon backing drivers or motorists entering a public road from a private lot is intended to protect those drivers traveling with the right-of-way from expected intrusions or hazards. Where a backing motorist collides with another driver whose vehicle does not have the right-of-way and that violation is a legal cause of the accident, the backing motorist owes the violator only a substantially reduced standard of care.

660 So.2d at 147, *see also Roy v. United Gas Corporation*, 163 So.2d 587, 592–93 (La.App. 3d Cir.), *writ refused*, 246 La. 593, 165 So.2d 485 (1964).

In this case, the duty owed by Wilson was substandard due to Simon's presence in the eastbound lane. Wilson, as a backing motorist from a private drive into a main thoroughfare, was required to operate her vehicle in a safe, reasonable manner. Simon, on the other hand, is also required to follow the rules of the road, which obviously entails operating her vehicle on the proper side of the roadway.

### 2. To What Extent is there a Presumption of Causation?

■ Plaintiffs contend that if the Defendants contest causation, they are bound to come forward with some other explanation or incident that caused the symptoms. *See Davis v. Galilee Baptist Church*, 486 So.2d 1021 (La.App. 2d Cir.1986). The relevant portion of the *Davis* opinion reads, "[w]hen some symptoms of the injury appear shortly after a traumatic incident and continuously worsen, a defendant who contests the cause-in-fact relationship must show some other particular incident could have caused the injury in question to overcome plaintiff's case." 486 So.2d at 1026, *citing Miller v. Allstate Insurance Company*, 221 So.2d 908 (La.App. 1st Cir. 1969) (emphasis added).

■ This presumption is not absolute. The Defendants must only show that some other particular accident could have caused the injury, not that some other accident actually did cause the injury. The *Basco* decision, cited by the Defendants, is illustrative on this point. *See Basco v. Natchitoches Parish Sheriff's Department*, 586 So.2d 733 (La.App. 3d Cir.), *writ denied*, 590 So.2d 80 (1991). In *Basco*, the court upheld the jury's finding that the plaintiff suffered no injury in an automobile collision. 586 So.2d at 734. Though the factual scenario is different from the one at hand, the court highlighted the importance of credibility and stated that the finder-of-fact is entitled to stray from the presumption. *Id.* The appellate court upheld the jury's verdict even in spite of the testimony of two physicians that the injury resulted from the accident. *Id.* Notably, the court stated, "[o]ur study of the record and assessment of the jury verdict causes us to conclude that [the plaintiff] failed to convince the jury that he suffered an injury … simply because they did not believe him." *Id.* In this court's view, credibility is thus a determinative factor and the court should look at the entire record.

### 3. May the Court Consider the Degree/Force of Impact?

Plaintiffs claim that the force of the accident in this case is immaterial to any determination by the court because the testimony clearly established that Plaintiff suffered an injury. Plaintiffs go so far as

to state that the court may not even consider the force of the impact. *See Shaw v. Russell,* 652 So.2d 133 (La.App. 2d Cir. 1995); *Arceneaux v. Howard,* 633 So.2d 207 (La.App. 1st Cir.1993), *writ denied,* 634 So.2d 833 (1994); *Simpson v. Caddo Parish School Board,* 540 So.2d 997 (La. App. 2d Cir.1989); *Boykin v. Washington,* 401 So.2d 488 (La.App. 4th Cir.1981); *Robinson v. New Orleans Public Service,* 336 So.2d 933 (La.App. 4th Cir.1976); *Winchester v. Gerde–Newman & Company,* 297 So.2d 689 (La.App. 4th Cir.1974); and *Seegers v. State Farm Mutual Automobile Insurance Co.,* 188 So.2d 166 (La.App. 2d Cir.1966). Defendants, however, assert that the force of the impact is relevant and should be considered by the court. *See Fletcher v. Langley,* 631 So.2d 693 (La. App. 3rd Cir.), *writ denied,* 635 So.2d 1139 (1994); *Delahoussaye v. State Farm Mutual Auto. Ins. Co.,* 520 So.2d 891 (La.App. 3d Cir.), *writ denied,* 522 So.2d 561 (1987); *Gilbert v. Waddell,* 501 So.2d 330 (La.App. 4th Cir.), *writ denied,* 505 So.2d 57 (1987); and *Fisher v. Knight,* 381 So.2d 968 (La. App. 4th Cir.1980).

■ The court is inclined to agree with the defendants and finds that the force or degree of the impact is a relevant or material factor for the court to consider. The court finds that Plaintiffs reliance on the cases cited above is misplaced. Those cases which hold that the minimal force is immaterial as it relates to the extent of injuries seem to limit that principle to cases in which the record **clearly** establishes that plaintiff suffered some injuries as a result of the accident. ·*See Boykin, supra,* 401 So.2d at 488–89; *Shaw, supra,* 652 So.2d at 135; *Simpson, supra,* 540 So.2d at 1000. *Fletcher,* cited *supra,* appears to be the most persuasive authority on the subject. In that case, the court found that the "minimal or minor nature of an automobile accident is a fact which **may** be considered by the [finder of fact]." 631 So.2d at 695 (citations omitted) (emphasis added). In the present case, the court does not find that the record clearly establishes that Plaintiff suffered some injury as a result of the accident. As such, the court finds that degree of force or impact is a relevant factor to be considered.

## B. Comparative Fault

■ Louisiana Civil Code Article 2323(A) states that, in any action for damages, the percentage of fault must be apportioned among all persons causing or contributing to the injury, whether parties or non-parties. The court is directed to "consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages." *Douget v. Allen Parish Police Jury,* 520 So.2d 813, 816 (La. App. 3d Cir.1987), *citing Watson v. State Farm Fire & Casualty Insurance Co.,* 469 So.2d 967 (La.1985). In *Watson,* the benchmark of Louisiana comparative fault jurisprudence, the court stated:

In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

469 So.2d at 974.

■ In the instant matter, the court finds that both parties were equally at fault for the accident that occurred on October 30, 1996. Examining the nature of the conduct of each party and the causal relationship between that conduct and the damages, both parties are equally to blame for the collision. First, Kathy Wilson

could have avoided the accident. Wilson testified that she did not perform a "walkaround" of the vehicle. Surely this procedure would have revealed Simon's vehicle. Second, Wilson testified that she did not have to park in the manner she did. Wilson could have, rather, pulled the vehicle in the parking lot such that no backing maneuver would be required. Finally, she admitted that she was backing at only three miles per hour, that she could see eight to ten feet with the backing mirror, and she never saw the Simon's car until she felt the contact between the vehicles. Based upon the foregoing, the court finds that Kathy Wilson was fifty percent at fault.

The court also finds Angela Simon fifty percent at fault for the accident. Though the testimony was conflicting to some degree, the court believes that Simon reversed her vehicle into the eastbound lane in order to travel west. It is reasonable to assume that Wilson would not expect a vehicle to be in the wrong lane going the wrong direction. Additionally, the court believes that Simon could have easily avoided the accident. The situation was not one where events transpired so quickly as to render the drivers dependent upon their instincts. Simon testified that she had her windows down, Wilson was backing up slowly, and the court finds that she should have had ample opportunity to blow her horn or move her vehicle. Further, had she backed all the way into the westbound lane, where she should have been, Wilson would have had ample room to back out into the eastbound lane without difficulty. Thus, the court finds Angela Simon fifty percent responsible.

## C. Liability

■ The determinative issue in this matter is causation: Did the Plaintiffs establish by a preponderance of the evidence that Angela Simon's injuries resulted from the minor contact on October 30, 1996. The court finds that answer to that question must be no. Questions surrounding the credibility of Mrs. Simon, discrepancies in

the medical testimony, and the facts concerning the collision require such a result.

## A. Testimony of Angela Simon

First, the court addresses Mrs. Simon's credibility. As stated above, credibility is an important factor to be considered by the finder-of-fact. Mrs. Simon testified that she was in the westbound rather than eastbound lane when the collision occurred. The evidence contrary to such assertion is overwhelming. Officer Vice, Kathy Wilson and Robert Benoit all state that both Simon and Wilson stated that her car was in the eastbound lane. Further, the simple logistics of the parking lot also suggest a conclusion contrary to Simon's testimony. The court, having looked at the evidence in the way of diagrams and photographs, finds that Simon's car must have been in the eastbound lane.

There was also a great deal of testimony that Simon was not injured from the collision. Although some of the medical testimony revealed that an injury such as a herniated disc may not appear until some time after an accident, there was no conclusive testimony to that effect. Simon repeatedly told everyone at the scene that she was not injured and she repeatedly declined any medical assistance. Indeed, Mrs. Simon even urged Wilson to refrain from calling the police.

Simon's testimony regarding her medical condition and treatment also contains numerous inconsistencies. Dr. Bernauer testified that for Simon to endure the pain from her injury she would have to remain lying down the majority of the time. Simon testified, however, that she was forced to sleep sitting up. Simon also stated that she only had one chiropractic adjustment. The billing summaries from Health & Medical Practice Associates and Dr. Smith's notes of his Rule 35 examination show that Simon obviously had more than one adjustment. Simon told Dr. Smith that she had adjustments "daily." The court is also confused about whether Simon continues to suffer pain. During

her testimony, she stated that she no longer suffers any pain related to the accident. Simon told Dr. Smith, according to his notes, that she was still suffering pain on her right side on August 17, 1998.

### B. Medical Testimony

The medical testimony in this matter hardly establishes that the accident on October 30, 1996 caused the injuries to Mrs. Simon. The undersigned finds that the Defendants have come forward with two explanations of what **could** have caused the injury to Simon. Namely, Simon's injury could have been caused by the chiropractic adjustments performed at Health & Medical Practice Associates or some event between her MRI in January 1997 and her surgery. Turning to the chiropractic adjustments, for some reason, Simon disputes the frequency of these adjustments. As stated, it is obvious that she received more than one adjustment. Regarding the one adjustment she admitted to having, Simon stated that it "hurt to death," so that the chiropractor stopped. All the medical experts, Drs. Bernauer, Scwalben and Smith testified that a chiropractic adjustment could cause a herniated disc. Thus, if the court were to find that the January 1997 MRI did reveal a significant defect at C5–C6, the undersigned finds that the Defendants have come forward with a sufficient explanation of other possible causes for such injury.

Some event between the MRI in January 1997 and surgery could have also caused some injury to Mrs. Simon. Dr. Smith's testimony and the notes of the radiologists reveal that the defect at C5–C6, as shown on the MRI, was not significantly abnormal, did not impinge upon the nerve roots, and no trauma to the soft tissue was apparent. Three days prior to this MRI, the notes from Moss Regional ER state that Simon had a "full range of motion in her neck with pain" and her deep tendon reflexes were found intact. Upon examining Plaintiff on January 17, 1997, Dr. Scwalben's notes state that her strength appeared intact, and no neurological deficit was elicited. On February 26, 1997, during a visit to the Moss Regional ER, the treating physician found the cervical nerves intact and no motor or sensory deficit. On April 14, 1997, the treating physician in the Moss Regional ER found Simon's pain to be localized rather than radicular. The medical testimony adduced at trial seems to indicate that the herniated disc at C5–C6 did not appear until ten months after the accident. The testimony did not explain the delayed discovery of this condition. Indeed, over the course of many medical examinations performed on Mrs. Simon, the diagnoses are inconsistent to say the least. Nearly all of Simon's numerous examinations in the ER contain subjective complaints that the treating physician described as "neck pain." Given these varying diagnoses, it does not appear that Simon suffered a significant defect at C5–C6 until sometime after January 1997.

### C. The Accident

Third, turning to the facts of the accident, the Plaintiffs have not met their burden of establishing causation. The vehicle in which Simon was traveling was hardly damaged. The photographs introduced at trial show a minimal dent in the front lower portion of the driver's door. The point of impact was not even near Mrs. Simon's upper body. The LLV was not damaged and had a rubberized bumper that was designed to "give" in the event of a collision. Benoit testified that there was no paint residue from Simon's car on the bumper of the LLV. Both Simon and Wilson testified that the LLV was moving at a slow rate of speed and Simon's car was stopped. The uncontroverted testimony reveals that there were no skidmarks in the road or parking lot as a result of the collision and Simon's vehicle was not moved by the force of the contact. The totality of these facts, particularly the barely detectable dent near the front of the door, leads this court to find that there is simply no way that Mrs. Simon was injured in this minor mishap. To hold

otherwise would defy common sense and reason.

Simon's actions following the accident are also inconsistent with those of a person who has been injured. She did not request medical assistance even though assistance was offered by Wilson, Benoit and Officer Vice. Simon had no trouble getting out of the car and walking about following the accident. In fact, the testimony revealed that Simon did not even desire to have the police called. Given Mrs. Simon's behavior, the minimal nature of the damage to the vehicles and low rate of speed, this court finds that Plaintiffs have failed to meet their burden with regard to causation.

## IV. DAMAGES

### A. Damages for Personal Injury/Medical Expenses

Since this court has determined that the Plaintiffs have failed to establish, by a preponderance of the evidence, that Simon's injuries were the result of the October 1996 automobile accident, Simon is not entitled to recover any amounts for personal injuries or medical expenses.

### B. Property Damage

During her testimony, Angela Simon provided the court with three separate estimates of the property damage to her husband's vehicle. These estimates ranged from $813.12 to $1467.86. All three estimates include the cost of a new mirror. At trial, Simon testified that her mirror was damaged in the collision. All other witnesses, however, disputed this assertion. Namely, Officer Vice, Kathy Wilson and Robert Benoit all testified that the only damage to Simon's vehicle was the minor dent on the driver's door. Indeed, Simon's own statement to the police revealed that she claimed the damage to the mirror and fender were from a prior accident.

■ This court refuses to compensate Simon for any damage other than that which occurred as a result of the accident: the dent in her door.[10] Additionally, this court finds that the estimate dated July 31, 1997 contains other amounts that are nonrecoverable. The damage in the later estimate to the vehicle appears significantly greater than the other two estimates performed closer to the accident or damage that resulted from a delay in getting the vehicle repaired. The court interprets this additional damage as resulting from something other than the accident. The only two estimates to consider, then, are those amounting to $813.12 and $914.97.

The estimate from Billy Navarre Chevrolet in Sulphur, Louisiana includes an amount of $109.40 that is not related to the accident.[11] The total amount attributable to the accident would therefore be $703.72. The estimate from All Star Pontiac in Sulphur includes an amount of $190.15 that is not attributable to the accident.[12] The total amount attributable to the accident according to that estimate would be $724.82. This court is more inclined to accept the lower estimate, as the customer would likely do. According to this court's finding that Simon was fifty percent at fault for the accident, the total amount she is entitled to recover for property damage is $351.86.

---

10. Testimony revealed that the vehicle involved in the collision was later traded in on another vehicle. Defendants maintain that Plaintiff's trade-in of the vehicle bars any claim for property damage. The court disagrees and finds that Plaintiff is entitled to recoup whatever property damage resulted from the accident, reduced in proportion to this court's finding of fault on the part of Angela Simon.

11. This figure is arrived at by subtracting $101, the price of the mirror, and .3 units of labor indicated for paint (at $28 per unit) from $813.12.

12. This figure is arrived at by subtracting $97.75, the price of the mirror, and 1 unit of labor and 2 units of paint (at $28 per unit) for fender panel repair from $914.97.

## V. FINDINGS OF FACT

1. On October 30, 1996 a collision occurred between two vehicles in Vinton, Louisiana, one being a LLV operated by Kathy Wilson of the United States Postal Service and the other a 1991 Pontiac Sunbird operated by Angela Simon.

2. Angela Simon arrived as Kathy Wilson was placing mail in the four receptacles consisting of sixteen mailboxes a piece that serviced the trailer park in that area.

3. Kathy Wilson entered the parking lot and parked alongside the mail receptacles with her vehicle facing south.

4. Angela Simon entered the parking lot in her vehicle and parked along side of the LLV.

5. Angela Simon departed the parking lot immediately before Wilson, backing her vehicle out into the eastbound lane of Center Street with her vehicle facing west.

6. Wilson failed to notice Simon's vehicle as she backed out.

7. Wilson's LLV contacted the Sunbird at the right front door at a speed under five miles per hour causing minor damage to the right lower portion of the driver's door.

8. Angela Simon should not have backed her vehicle into the eastbound lane with the intention of traveling west.

9. Kathy Wilson should have noticed the vehicle behind her and avoided the accident.

10. Angela Simon had ample time to avoid the accident.

11. Angela Simon was treated at W.O. Moss Regional Hospital for complaints of pain.

12. Angela Simon was seen by Dr. Lee Scwalben for continued subjective complaints of pain in her left arm and shoulder.

13. Between November 8, 1996 and December 30, 1996, Angela Simon received chiropractic adjustments as part of her treatment by Health Practice & Associates.

13. An MRI performed over two months post-injury revealed a central disc bulge at C5–C6 on Angela Simon.

14. This disc bulge was not the result of the accident that occurred on October 30, 1996, nor did Mrs. Simon sustain any personal injury in the accident.

## VI. CONCLUSIONS OF LAW

1. Kathy Wilson failed to back her vehicle in a safe manner and was fifty percent (50%) at fault for the accident that occurred on October 30, 1996.

2. Angela Simon operated her vehicle in a negligent manner and was fifty percent (50%) at fault for the accident that occurred on October 30, 1996.

3. The accident on October 30, 1996 did not cause any physical injuries to Angela Simon.

4. As a result of both parties' negligence, Angela Simon's vehicle was damaged in the amount of $703.72.

## VII. CONCLUSION

The court will render judgment in accordance with the above findings of fact and conclusions of law.

### *JUDGMENT*

For the reasons stated in the corresponding opinion of the court entered this date, it is hereby

ORDERED that there be judgement in favor of Angela Simon and against the United States of America in the full sum and amount of $351.86 together with legal interest from date of judgment until paid in full.

IT IS FURTHER ORDERED that all costs of court be divided between the parties in equal parts.