LEDET, J.,
dissents with reasons.
hln my opinion, the dispositive issue on this appeal is causation. Because I would *1102 find the Serou Plaintiffs[1] failed to establish causation, I would reverse the damage award and thus not reach the other issues presented on appeal.
As the majority points out, the Serou Plaintiffs contend that they proved Mr. Serou’s cause of death was due to heat, hyperthermia. Citing McKelvey v. City of Dequincy, 07-604, p. 9 (La.App. 3 Cir. 11/14/07), 970 So.2d 682, 689, the Serou Plaintiffs contend that they only were required to provide the court with competent evidence of the cause of death. The competent evidence they presented, according to the Serou Plaintiffs, consists of the following: Dr. Tedesco’s August 31 chart note, which reads: “Hurricane note Pt. [patient] expired 2° [secondary to] heat” (referred to as the “hurricane note”); Dr. Tedesco’s deposition testimony in which he held to his position that Mr. Serou died secondary to heat; and Dr. Tedesco’s trial testimony in response to a hypothetical question that heat was a possible cause of Mr. Serou’s death. Alternatively, the Ser-ou Plaintiffs contend that the so-called Housley presumption, which is based on Housley v. Cerise, 579 So.2d 973, 980 [2(La.1991), applies and that proof of a reasonable possibility of a causal connection is sufficient.
The majority concludes that Dr. Tedes-co’s chart note coupled with his deposition testimony was sufficient evidence to establish that it was more probable than not that Mr. Serou died from hyperthermia. I disagree. I would find that Dr. Tedesco’s chart note coupled with his recanted deposition testimony was insufficient evidence to establish causation. I would further find that the Serou Plaintiffs failed to present any other competent medical evidence of causation. I would still further find that the Serou Plaintiffs’ reliance on the Hous-ley presumption is misplaced.
This court in Williams v. Stewart, 10-0457, pp. 6-7 (La.App. 4 Cir. 9/22/10), 46 So.3d 266, 272, summarized the jurisprudence regarding the Housley presumption as follows:
• In meeting the burden of proving causation, a plaintiff may be aided by a presumption of causation if before the accident the plaintiff was in good health, but subsequent to the accident the symptoms of the disabling condition appear and those symptoms continuously manifest themselves afterward providing that the evidence establishes a reasonable possibility of causal connection between the accident and the disabling condition. Dabog v. Deris, 625 So.2d 492, 493-94 (La.1993); Housley v. Cerise, 579 So.2d 973, 980 (La.1991).
• This so-called Housley presumption can be broken down into three component parts: (i) the plaintiff must prove that he or she was in good health before the accident; (ii) the plaintiff must prove that subsequent to the accident symptoms of the alleged injury appeared and continuously manifested themselves afterwards; and (iii) the plaintiff must prove through evidence — medical, circumstantial, or common knowledge — a reasonable possibility of causation between the accident and the claimed injury. Juneau v. Strawmyer, 94-0903 (La.App. 4 Cir. 12/15/94), 647 So.2d 1294, 1299. The plaintiff has the burden of proving each component part by a preponderance of the evidence. Id.
*1103 • The Housley presumption is rebutta-ble; the defendant may rebut it by showing that some other particular incident could have caused the disabling condition. 19 Frank L. Maraist, Louisiana Civil Law Treatise: Evidence and Proof, § 4.3 (citing Simon v. United States, 51 F.Supp.2d 739 (W.D.La.1999)); Dixon [v. Travelers Ins. Co.], 02-1364 at pp. 8-9 [ (La.App. 4 Cir. 4/2/03)], 842 So.2d [478] at 484; Maranto, swpra.
|sThe application of the Housley presumption of causation to the facts is a question of fact and subject to manifest error review. Williams, 10-0457 at pp. 8-9, 46 So.3d at 273; Detraz v. Lee, 05-1263, p. 9 (La.1/17/07), 950 So.2d 557, 562-63.
Applying those principles to the facts of this case, the Serou Plaintiffs cannot establish the threshold Housley requirement of establishing that Mr. Serou was in good health before the accident (in this case before the hurricane). Although Mr. Ser-ou’s treating physician, Dr. Langie, in her August 3, 2005, discharge summary quoted earlier, states that “[t]he patient is usually in a very good state of health,” Dr. Borg-man questioned the statement. As Dr. Borgman pointed out, the statement is inconsistent with the prior line of the discharge summary, which reads: “[t]he patient is a 67-year-old male [nursing home resident] ... with a diagnosis of Parkinson’s disease, dementia, coronary artery disease, as well as paralysis agitans.” Dr. Borgman further testified that Mr. Serou was suffering from “a long list of ailments,” which he enumerated as follows: “[h]e was demented. And the dementia appeared to be progressive since early in August judging by the progress notes. He had Parkinson’s Disease. He had contrac-tures and he had a large decubitus described over the hip.”
Likewise, Dr. Tedesco characterized Mr. Serou “as a pretty frail guy.” According to Dr. Tedesco, Mr. Serou was an appropriate candidate for hospice care given that he had “severe dementia and was uncommunicative, and again with the muscle contractures and large decubitus ulcers.” When asked whether there was any indication in Mr. Serou’s chart that he had less than six months to live, Dr. Ted-esco replied that “it seems that way to me.” Dr. Tedesco explained that “his body contractures, his decubitus, dementia, inability to get out of bed on his own, most patients with those combinations of factors are going to come with, you know, a combination of infections ... you tend to be kind of at the end of life.”
|4On the other hand, Mr. Serou’s wife and three children testified that they had no expectation that Mr. Serou was going to die within a few months. Nonetheless, his wife and children all acknowledged that Mr. Serou had a long history of Parkinson’s disease, heart disease, and immobility following a broken hip in 2003. The record thus does not support a finding that Mr. Serou was in “good health” before the hurricane.[2] The Serou Plaintiffs’ reliance on the Housley presumption is thus misplaced.
Given the lack of any presumption of causation, the Serou Plaintiffs were required to present competent evidence of the cause of death. As noted, the Serou Plaintiffs contend, and the majority agrees, that the competent evidence they presented included Dr. Tedesco’s July 1, 2010 deposition testimony. In his deposi *1104 tion, Dr. Tedesco confirmed the hurricane note and stated that it was more probable than not that Mr. Serou died due to heat. The crux of the Serou Plaintiffs’ argument is that Dr. Tedesco’s deposition testimony, which was introduced as evidence, was more credible than his trial testimony.
At trial, Dr. Tedesco recanted his hurricane note and his prior deposition testimony; particularly, he testified in response to the Serou Plaintiffs’ counsel’s questions as follows:
Q. Now, when I took your deposition on July 1, 2010, you told me, isn’t it true you told me that more probably than not, not absolutely positively, more probable than not Mr. Serou died due to the heat, is that correct?
A. That’s correct.
Q. And what I’m asking you here today is it still your opinion that Mr. Serou died more probably than not due to heat?
A. No, I don’t. Like I said, it’s kind of embarrassing but I kind of go into that statement the same way that I did see the patient |fiwhen I first saw him, with no knowledge. I walked in only seeing him after he already died, did not review the chart.
The Serou Plaintiffs’ attorney then showed Dr. Tedesco an excerpt from the chart of Mr. Serou’s roommate in the SHONO unit. On the night of August 31, apparently a few hours after Mr. Serou died,[3] a SHONO nurse wrote in the roommate’s chart the following: “[r]oom is unbearably hot.” Based on this additional information, Dr. Tedesco testified that he was “not saying that it ruled out that he died of heat, it’s certainly a possibility. I just have no way of telling you given his previous condition there’s no way to say what it was.”[4] The Serou Plaintiffs’ attorney again questioned Dr. Tedesco regarding his prior deposition testimony.
Dr. Tedesco acknowledged that in his deposition, even after the deficiencies in the chart were called to his attention, he stated that it was his opinion that Mr. Serou died from heat. The following colloquy between the Serou Plaintiffs’ counsel and Dr. Tedesco then took place:
Q And so the real question to me is what is so dramatically changed from the day you wrote that note and the day you gave me your deposition, that you have come into this court, and I believe, or at least partially changing your opinion today?
A Well because now for the first time I have gone back and looked through the chart myself, just because the guy was never a patient of mine. So I kind of took a lot of things for granted in going in there. And so I just wanted to be comfortable with myself when I was looking at it. And when I looked back at it I don’t feel as comfortable making that call.
In sum, Dr. Tedesco’s trial testimony was that he no longer held an opinion based, on his review of the entire record that Mr. Serou died from hyperthermia (heat).[5]
|fiDr. Tedesco was also asked whether it was just a coincidence or whether it had *1105 more to do with the environment that six of sixteen patients died on the SHONO unit between August 29 and 31; he replied:
I am not surprised at all. When you look at again, and Mr. Serou falls within this, what I’m going to call a category of patients, typical patients that are in L-TAC units are extremely frail, most of them are relatively close to the end of life. They are the sickest — well, I don’t know if I’d say the sickest of the sick, but they’re very frail people. They don’t tolerate much deviations in their environment, that’s for sure.
When asked about monitoring such patients, Dr. Tedesco testified “[tjhat’s what nursing care is all about.”[6]
At the beginning of trial, the trial court refused the Serou Plaintiffs’ request to admit Dr. Tedesco’s deposition.[7] Following Dr. Tedesco’s trial testimony in which he recanted the hurricane note and deposition testimony, the trial court, over Touro’s counsel’s objection, allowed the deposition into evidence.[8] Although the trial court correctly admitted the deposition for purposes of impeachment (prior inconsistent statement), the trial court incorrectly treated the deposition testimony as substantive evidence. As discussed below, Dr. Tedesco’s deposition testimony was only admissible as impeachment evidence (prior inconsistent statement), not as substantive evidence in this civil case.
17“In civil cases the traditional Louisiana rule — that a witness’ prior inconsistent statements are admissible only to attack the witness’ credibility, and not for their assertive value — continues in force.” George W. Pugh, Robert Force, Gerald A. Rault, Jr., and Kerry Triche, Handbook on Louisiana Evidence Law, La. C.E. art. 801, Authors’ notes (4) at p. 631 (2011 ed.^‘Louisiana Evidence Handbook ”).[9] *1106 Although La. C.E. art. 607(D)(2) provides that a witness may be impeached by evidence of the witness’ prior inconsistent statement, the use of that evidence, as a commentator has explained, is subject to the restrictions imposed by the hearsay rule:
When admitted into evidence in a civil case, the out-of-court statement usually may not be used by the jury (or argued by counsel) for its inherent “truth value,” because for that purpose it is ordinarily impermissible hearsay.... That is, the out-of-court contradictory statement may not be accepted as true in a civil case, but may be used solely to raise the inference that the witness’ in court testimony is perhaps rendered less credible because the witness has contradicted himself[.] (When, however, the out-of-court statement is defined as non-hearsay under Article 801(D)(1) or (4), or is a party’s statement offered against him and hence non-hearsay under Article 801(D)(2) or (3), or, although hearsay, falls within a hearsay exception of Article 803 or 804, then the out-of-court statement may be used for either or both purposes, to discredit the witness’s testimony and for the truth value of the earlier statement....)
Louisiana Evidence Handbook, La. C.E. art. 607, Authors’ Note 9 at pp. 540-41; See also La. C.C.P. art. 1450(A)(providing for the admission of deposition testimony “so far as admissible under the rules of evidence.”) It follows then that “[a] prior inconsistent statement offered only to impeach is not substantive |sevidence which will support a judgment in favor of the party offering it.” 19 Frank L. Maraist, Louisiana Civil Law Treatise: Evidence and Proof, § 9.6 (2011).[10]
The only exception to the restrictions imposed by the hearsay rule alluded to in this case is for a party’s statement offered against him. That exception for a party’s statement, however, is not applicable in this case. Contrary to the Serou Plaintiffs’ suggestion, Dr. Tedesco testified that he was not an employee of Touro. I thus would find the Serou Plaintiffs’ reliance on Dr. Tedesco’s deposition testimony as competent, substantive evidence to satisfy their burden of establishing causation is misplaced.
As noted, the Serou Plaintiffs also rely on a hypothetical question their counsel posed at trial to Dr. Tedesco, which was as follows:
Q. Alright, I am going to ask you a hypothetical question. Assume for the purposes of this question that Mr. Serou was in a hot room with no air conditioning, and a Clinitron bed had no power to it, down in that Clinitron bed, for a period of time, a number of hours, would that — and that the nurse had stripped *1107 him naked and was trying to apply wet rags to him, would that effect your opinion as to whether or not he died from heat related symptoms?
[Objection overruled].
A. Yes. I think all those conditions could increase the chance of somebody having hyperthermia.
Q. Fifty-one percent?
A. You know I don’t know how to put a percentage on it given the patient’s other medical problems.
Q. Assuming that he was not terminal from any other medical condition based on the hypothetical I just gave you, more probable than not would he have died from heat related—
A. If he has no other medical problems, sure.
Q. That’s a yes?
IflA. Yes.
As Touro points out, Dr. Tedesco expressly hinged his response to the above question on the hypothetical patient having “no other medical problems.” Such was not the case for Mr. Serou; he had a host of other medical problems. Mr. Serou’s prior medical problems were discussed earlier in this dissent in addressing the inapplicability of the Housley presumption given that Mr. Serou was not in “good health” before the hurricane. The Serou Plaintiffs’ reliance on Dr. Tedesco’s response to the above hypothetical question as competent evidence of causation is thus misplaced.
The Serou Plaintiffs also suggest that causation can be inferred from the circumstances. As the majority notes, six of the sixteen patients in the SHONO unit died in the aftermath of Hurricane Katrina between August 29 and 31.[11] The Serou Plaintiffs contend that it got “unbearably hot” in the SHONO unit. They point out that the consistent testimony of the Touro witnesses that it only got “warm” is contradicted by other evidence. For example, the Serou Plaintiffs introduced an article entitled “In the Eye of the Storm,” which was published in Winter 2005 edition of the Touro Focus. In the article, Touro’s CEO, Mr. Hirsch, is quoted as stating that in the aftermath of the hurricane “[o]ur [Touro’s] backup generators were failing. We began losing lighting, air conditioning and elevator service. It quickly became unbearably hot, especially for patients.” The Serou Plaintiffs also introduced the SHONO Nurse’s note in Ms. Serou’s roommate’s chart stating that the “[r]oom is unbearably hot.” The Serou Plaintiffs likewise point out that the SHONO nurses communicated with Dr. Tedesco regarding the patient’s condition and the environment of care before he declared Mr. Serou dead and wrote the hospital note.
11 (Although circumstantial evidence may be used to meet a plaintiffs burden of proof of causation, the evidence, if circumstantial evidence is relied upon, must taken as a whole exclude every other reasonable hypothesis with a fair amount of certainty. Lacey v. La. Coca Cola Bottling Co., 452 So.2d 162 (La.1984). In this case, Dr. Borgman provided a list, which did not include hyperthermia, of what could have killed Mr. Serou; he testified:
“Well, I don’t discount the possibility of heart disease. I don’t discount the possibility of sepsis, totally, as has been put out there. You know, this is going to *1108 seem awfully — how can I put that, narrow, but people with chronic illnesses who are old simply die. And we don’t always know why they die. And I don’t, you know, I think there is so many possibilities here that, you know, I don’t know.”
The Serou Plaintiffs offered no medical evidence to exclude all of these other reasonable hypotheses of what caused Mr. Serou’s death with a “fair amount of certainty.” Lacey, supra. In contrast, Touro provided the testimony of three medical experts — Dr. Tedesco, Dr. Borgman, and Dr. Jordan — that the cause of Mr. Serou’s death was not hyperthermia.
Dr. Borgman testified that it was more probable than not that the cause of Mr. Serou’s death was not hyperthermia. He testified that there were at least three reasons why he did not believe Mr. Serou died from hyperthermia:
“[T]he sine quo non, the hallmark of hyperthermia is volume dimension. In the elderly first, it is hyperthermia is related to the loss of mechanics, the mechanism to manage heat that the body creates. But in this case this man was hydrated. And we have two evidence, points of evidence for that, the first is he was getting IV fluids. So you at least know that you’re putting TV fluids into him. But then there is the secondary measure of that. And that is that the urine output as of the last day it was recorded was more than adequate. And the urine output will reflect the state of hydration. The third point, which I will make, because I — and this was material I looked at in anticipation of being here today, was I looked at the autopsy report. In the autopsy report they talk about pulmonary emboli, pulmonary edema. Now when I first read that and then I read some of my reference material it — pulmonary edema was not |„ mentioned as part of the patho-physiology of heat stroke. However, in looking at a number of other resources, ... it does occur, and it may occur secondarily from ARDS, Adult Respiratory Disease Syndrome, which sometimes accompanies heat stroke. But I went a little further, and I spoke to the pathologist at Touro.”
Although the trial court would not allow Dr. Borgman to testify regarding his discussions with the pathologist, the court allowed him to give the opinion he formed after receiving the information. Dr. Borg-man testified that he formed the opinion that “there is no evidence for heat stroke, but I can not tell you why he died.” However, Dr. Borgman reiterated that in his opinion Mr. Serou did not die because of hyperthermia.
Addressing the lack of any indication in the record that Mr. Serou had any IV fluids after August 30 when the nurses stopped charting, Dr. Borgman testified that “[t]here no indication in the record that he did, but none that he did not.” Dr. Borgman was questioned regarding Nurse Johnson’s testimony that the IV pumps were not working after they lost electricity and that they were not able to efficiently administer the drugs and hydration from the IV to the patient. Dr. Borgman replied that “it would have been a very simple matter to turn off the IV pump and just let the IV run in at the rate like we used to do years ago.” He further noted that there is no indication that Mr. Serou stopped getting IV fluids. Moreover, Dr. Borgman testified that, during the time he treated Mr. Serou (from August 27 to 30), he never ordered that the IV fluids be stopped.
Dr. Jordan, who was qualified by the trial court as an expert in the field of emergency medicine, opined that that if a patient was receiving hydration though IV *1109 fluids the probability that the patient would develop hyperthermia is “virtually null.”[12] He opined that Mr. Serou was receiving IV fluids in an adequate amount to hydrate someone his body size. In addition, Mr. Serou was receiving antibiotics 11?by IV and taking a good amount of medication by mouth for his Parkinson’s disease and other ailments. Dr. Jordan testified that “[cjertainly someone who was progressing along that path of hyperther-mia was starting to have nausea, start to vomit, most often profusely, would then begin to sweat profusely in trying to cool— this kind of is analogous to that wetting you down, blowing your fan over you, your body tries to do that and to compensate and then you develop heat stoke and some folks actually have seizures and alteration of mental status and then organs shut down.”
Dr. Jordan agreed that the symptoms of heat related illness include “fatigue, cramps, nausea, decreased urinary output, vomiting, loss of mental status, dizziness, loss of ability to sweat, non-responsive, near comatose and go into a seizure.” He testified that there were no signs in Mr. Serou’s chart that he exhibited any symptoms of heat related illness, hyperthermia.
Dr. Jordan stressed that his opinion was that “there was nothing in the record” indicating Mr. Serou died of hyperthermia. Dr. Jordan acknowledged that his opinion that Mr. Serou did not die due to hyperth-ermia was based on never seeing this patient, never knowing this patient, and an incomplete (deficient) chart.[13]
To recap, Touro presented three medical experts who opined that Mr. Serou did not die from hyperthermia. Neither Touro nor the Serou Plaintiffs, however, offered any medical expert testimony as to what Mr. Serou did die from. The burden of establishing medical causation was on the Serou Plaintiffs. The trial court in its reasons for judgment, as the majority notes, did not discuss the issue of | ^whether the Serou Plaintiffs satisfied their burden of establishing causation. The trial court’s reasons for judgment include only the following statement, in the recital of the factual background, regarding the cause of Mr. Serou’s death: “Immediately after the hurricane, Mr. Serou’s health rapidly deteriorated.[14] Ultimately, on Wednesday, August 31, 2005 Dr. Victor Tedesco, IV declared Mr. Serou dead, due to hyperthermia.” The trial court apparently based its factual finding of causation on Dr. Tedesco’s deposition testimony in which he confirmed his hurricane note that *1110 Mr. Serou died secondary to heat — due to hyperthermia. For the reasons discussed above, I would find that the trial court erred in relying on Dr. Tedesco’s recanted deposition testimony regarding the hurricane note as substantive evidence. The hurricane note itself likewise is insufficient evidence. The Serou Plaintiffs failed to present any other competent medical evidence that Mr. Serou died as a result of hyperthermia.
In sum, contrary to the majority, I would find that the Serou Plaintiffs failed to present competent evidence that Touro was a cause of Mr. Serou’s death or suffering. For this reason, I would find that the trial court erred in rendering judgment in the Serou Plaintiffs’ favor and against Tou-ro.[15] Because I would find the Serou Plaintiffs failed to prove causation, I would find it unnecessary to reach the other issues Touro raises on appeal regarding allocation of fault and damages.
| M Given that I would reverse the trial court’s finding in favor of the Serou Plaintiffs on the principal demand against Tou-ro, I would find Touro’s indemnification cross-claim against Aggreko moot. For the same reason, I would find Aggreko’s answer to Touro’s appeal moot. For all these reasons, I respectfully dissent.

. The plaintiffs are Mr. Serou’s surviving spouse (Judy Serou) and their three adult children (Gordon Serou, Jr.; Stephen Serou; and Michael Serou). For ease of reference, the plaintiffs are referred to collectively as the “Serou Plaintiffs”).

. Contrary to the Serou Plaintiffs' suggestion, even assuming the record supported a finding that Mr. Serou’s condition before the hurricane could be labeled as "stable,” the Housley presumption would nonetheless be inapplicable because the record reflects that Mr. Serou was not in "good health,” which is the threshold requirement for the presumption to apply.

.The record indicates that the exact time of Mr. Serou’s death is undetermined. Dr. Borgman testified that Mr. Serou was definitely alive on August 30, and Dr. Tedesco wrote the note in the chart at 5 p.m. on August 31. Nurse Johnson testified that she could not give an exact time of Mr. Serou’s death.

. At this juncture, the Serou Plaintiffs called to the trial court's attention the Housley presumption, which as discussed elsewhere is not applicable in this case.

. He also stated that he did not recall it being intolerable on the SHONO unit when he was asked by the SHONO nurses to pronounce Mr. Serou dead. Dr. Tedesco agreed that he would defer to the treating physician, Dr. *1105 Borgman, as to the cause of death. Finally, he testified that during the lock down and until the evacuation he was involved in passing information to Mr. Hirsch and other administrators regarding the conditions of the patients.

. In this case, the duty to provide clinical and medical care to Mr. Serou was on the SHO-NO staff, not on Touro. As Touro points out, and the trial court recognized in its reasons for judgment, the SHONO nursing staff was under-supervised and understaffed. As Touro points out, SHONO’s decision to allow eight of its ten staff members assigned to its L-TAC unit to leave on August 30 begs the question of whether the numerous nursing interventions to alleviate heat related symptoms could have been provided. Regardless, a breach of the duty to provide proper medical care is a medical malpractice claim; this was tried solely as a premises liability case.

. At the beginning of trial, the trial court denied the Serou Plaintiffs' request to introduce Dr. Tedesco’s deposition into evidence on the basis that the witness might testify differently at trial.

. In admitting the deposition the trial court noted that under normal circumstances it would not be admissible since the witness testified at trial; however, the court found it admissible because the witness' trial testimony was divergent from his deposition testimony. Although the parties did not raise the issue, I note that technically the trial court should have only admitted the prior inconsistent statement in the deposition and not the entire deposition. As a commentator has noted, "[i]n civil trials it seems a not uncommon misconception that when a witness has made a prior inconsistent statement in a deposition the entire deposition becomes admissible. This is false, of course, and under the appropriate application of Articles 402 and 403 only the portion of the deposition relevant in contradicting the current testimony ought be admitted.” George W. Pugh, Robert Force, Gerald A. Rault, Jr., and Kerry Triche, Handbook on Louisiana Evidence Law 2011, La. C.E. art. 607, Authors’ notes (8) at 539.

. A different rule applies in criminal cases since 2004 when the Legislature amended La. C.E. art. 801(D)(1)(a) to provide;
D. Statements which are not hearsay. A statement is not hearsay if:
*1106 (1) Prior statement by witness. The declar-ant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement.

. See Marshall v. Duncan, 542 So.2d 691, 695 (La.App. 4th Cir. 1989) (citing Smith v. New Orleans Public Service, Inc., 391 So.2d 962 (La.App. 4th Cir.1980))(holding that the use of a prior inconsistent statement is limited to impeachment and cannot be utilized as substantive evidence); Jenkins v. Baldwin, 00-0802, p. 7 (La.App. 4 Cir. 8/29/01), 801 So.2d 485, 491 (citing City of New Orleans v. Hamilton, 602 So.2d 112 (La.App. 4th Cir.1992)) (holding that "[t]he testimony of the prior proceedings can only be considered for impeachment purposes and not for the truth of the matter asserted”).

. Although Dr. Jordan agreed that it would be unusual to have six patients in the same unit die in a three days period, he added "[t]hat would be unusual under circumstances of normal functioning, but we were in a situation where this was a never before seen or had emergency.” As to whether it can be stated that it was an environmental factor and not just a coincidence that six people died, Dr. Jordan replied that "I can't draw that conclusion at all."

. Similarly, Dr. Aiken testified that, in his professional opinion, there was no reason that a patient who was receiving critical care, including IV fluids, would die of a heat-related illness.

. Charting by the SHONO nurses on Mr. Serou’s chart stopped on August 29. There is no indication of what was going on with Mr. Serou from when Dr. Borgman made a note on August 29 until when Dr. Tedesco made his hurricane note declaring Mr. Serou had died at 5 p.m. on August 31. The vital signs also stop after 2300 on August 29; the last IV note in the record was on August 28. The incomplete (deficient) chart, Dr. Jordan testified, was the responsibility of the caregiver for the patient and the facility. Since Mr. Serou was a SHONO patient who was being cared for by SHONO nurses, the charting was the SHONO nurses’ and that facility’s responsibility.

.There is nothing in the record supporting that immediately after the hurricane Mr. Ser-ou’s health deteriorated rapidly. To the contrary, Dr. Borgman, who saw Mr. Serou daily, testified that there was no change in Mr. Serou's condition from August 27 through August 30. However, the Serou Plaintiffs in their proposed reasons for judgment included the following statement: “on August 31, 2005, when the conditions deteriorated rapidly and Mr. Serou died.”

. As the majority points out, the same factual allegations formed the basis of the Serou Plaintiffs’ wrongful death and survival actions; hence, my conclusion that there was insufficient evidence of causation applies equally to both claims.