842 So.2d 478 (2003)
Cynthia E. DIXON
v.
TRAVELERS INSURANCE COMPANY, Goodyear Tire & Rubber Company, D.L. Peterson Trust and Shane Boyles.
No. 2002-CA-1364.
Court of Appeal of Louisiana, Fourth Circuit.
April 2, 2003.
Rehearing Denied April 30, 2003.
*480 Jodi Jacobs Aamodt, Jacobs, Manuel & Kain, and A. Remy Fransen, Jr., Fransen & Hardin, New Orleans, LA, for Plaintiff/Appellant.
David S. Bland, Bryan J. De Tray, David A. Strauss, King, Leblanc and Bland, New Orleans, LA, for Defendants/Appellees.
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge DAVID S. GORBATY).
PATRICIA RIVET MURRAY, Judge.
This is a personal injury action arising out of a minor rear-end collision. Cynthia Dixon commenced this action against the rear-ending motorist, Shane Boyles; his employer, Goodyear Tire & Rubber Company; the owner of the vehicle, D.L. Peterson Trust; and the insurer of the vehicle, Travelers Insurance Company (collectively referred to as the "Defendants"). As a result of the collision, Ms. Dixon claimed that she injured her neck, necessitating a three level cervical fusion at C4-5, C5-6, and C6-7, and re-injured her back, necessitating a lumbar fusion at L4-5. Although Defendants stipulated to liability, they strongly contested causation and damages.
On December 4th through 7th, 2001, this case was tried before a jury on the issues of causation and damages. Responding to the special interrogatories on causation, the jury found Ms. Dixon's neck injury was caused by the accident, but her back injury was not. Itemizing damages for her neck injury, the jury responded as follows: $25,000 for past pain and suffering, $15,000 for future pain and suffering, nothing for mental anguish, $30,000 for past lost wages, and $75,000 for impairment of earning capacity. The jury's award for the neck injury thus totaled $145,000. The trial court rendered judgment in accord with the jury's responses. The trial court also awarded the stipulated amount of medical expenses relating to the neck injury of $51,724.16,[1] making the total damage award equal to $191,724.16.[2] Ms. Dixon filed three post-trial motionsnew trial, judgment notwithstanding the verdict, and additurarguing that the jury's quantum award for her neck injury was inadequate and that the jury's failure to find her back injury resulted from the accident was reversible error. The trial court denied all three motions. Reasserting *481 the same arguments she raised in her post-trial motions, Ms. Dixon filed the instant appeal. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
The facts regarding the stipulated rear-end collision are undisputed. As alleged in the petition, on October 7, 1998 at about 9:45 a.m., Ms. Dixon was driving a taxicab owned by Victor Ruffino. She was in the course and scope of her employment as a taxicab driver with United Cab Company.[3] While Ms. Dixon's taxicab was stopped in traffic on St. Charles Avenue in New Orleans, it was rear-ended by a pickup truck driven by Mr. Boyles. Mr. Boyles was in the course and scope of his employment with Goodyear and delivering a load of tires.
At trial, Mr. Boyles testified that it was lightly raining at the time of the accident and that the pickup truck he was driving slid, bumping into the back of Ms. Dixon's taxicab. After the collision, he stated that both he and Ms. Dixon exited their vehicles. Mr. Boyles testified that he asked Ms. Dixon twice if she was injured; both times she responded that she was fine. He further testified that they both agreed it was not necessary to call the police. He still further testified that Ms. Dixon ultimately determined that it was necessary for her to report the accident to United because she was leasing the taxicab and because she could lose her cab license if she did not report it.
In response to Ms. Dixon's report, United sent Mark Adolph, an adjuster for its insurer, to the scene. Mr. Adolph testified that his involvement with this accident was limited to asking questions at the scene, taking pictures, and preparing a report. In response to his questions at the scene, Mr. Adolph testified that Ms. Dixon told him that she was shaken up but not injured. His pictures showed minimal damage to the vehicles.[4] His report described the accident as follows: "[Mr. Boyles] stated he was following the insured [Ms. Dixon] and applied his brakes to stop but slid on the wet roadway into the rear of the insured."
Ms. Dixon testified that she was thrown back and forth inside the taxicab as a result of the collision and that shortly thereafter she experienced back and neck pain. Nonetheless, she testified that immediately after the accident she resumed driving her taxicab, picking up passengers at Touro Hospital and bringing them to the French Quarter. When she went home that day, she called a friend who gave her the name of an attorney. That same day, she retained the attorney. The attorney then referred her to see Dr. John Watermeier, an orthopedic surgeon with the Louisiana Clinic.
Dr. Watermeier testified that when he first saw Ms. Dixon on October 12, 1998 she complained of neck and back pain following an automobile accident. Based on his examination, he opined that she had some arthritis and a pre-existing back injury, that she had been in "pretty good health until this recent auto accident," that "her October 7th injury both aggravated her preexisting condition and caused additional trauma to her spine, both her neck and low back," and that she had a cervical disc injury. At that time, he opined that *482 she was temporarily disabled from working.
At the time of the accident, Ms. Dixon was fifty-three years old. Dr. Watermeier acknowledged that degenerative changes are common to people who are in their fifties, like Ms. Dixon, and that as we get older we all start having arthritic or degenerative changes in our neck or back. He also acknowledged that the severity of the accident is something he would ask a patient about and that Ms. Dixon told him the October 7th accident was "a minor event and she was wearing her seat belt."
On the Louisiana Clinic intake questionnaire, which Ms. Dixon completed five days after the accident, she indicated that her neck and back pain began one hour following the accident and that she was not in acute distress. On the portion of the questionnaire seeking history of injury or treatment to the back and neck, she listed a 1989 fall down stairs and a 1995 epidural at Charity. At trial, Ms. Dixon denied any prior neck injury, but acknowledged having a prior back injury. Elaborating on her prior back injury, Ms. Dixon testified that she hurt her back in 1989 while she was working as a pipe fitter's helper; the injury occurred during the hard freeze that year when she fell down seven or eight steps taking laundry down to her basement, bruising her butt. Although in her deposition she indicated that she began having back pain periodically after her 1989 fall, she testified at trial that her back pain did not begin until August 1992, which coincided with her being laid off from her job as a pipe fitter's helper. She still further testified she was first seen for her back pain at Charity Hospital in January 1993 and that she told the doctors at Charity that her back injury was caused by her 1989 fall.
Over the course of the next two and one-half years, Ms. Dixon testified that she was seen at Charity a total of about eight times for her back pain. On August 7, 1995, she stated that was given an epidural injection at Charity, which she claims cured her back pain. Indeed, she testified that she "[n]ever had a problem again. As a matter of fact, I went dancing the following weekend." Following the October 7th accident, she claims her back pain reappeared.
It is undisputed that the first time Ms. Dixon sought medical treatment following the October 7, 1998 accident was on October 12, 1998 when she saw Dr. Watermeier. Dr. Watermeier initially attempted to treat Ms. Dixon conservatively with physical therapy (i.e., heat, massage, ultrasound, traction), a back brace, a cane to assist in ambulating, and medication (prescribing Xanax for sleep and Lortab for pain). Dr. Watermeier also ordered that she attend physical therapy, which she attended for about six months without obtaining relief. He also ordered that she undergo epidural injections. Although the injections had worked in the past (at Charity in 1995), the injections only provided her with temporary relief. During the conservative treatment, Dr. Watermeier also ordered diagnostic testing, including MRIs of the neck and back and an EMG. Those tests were performed on October 27, 2000, twenty days after the accident.
Given that Ms. Dixon was not improving with this conservative treatment, in April 1999, Dr. Watermeier performed a three-level anterior cervical fusion. Following the surgery, Ms. Dixon continued seeing Dr. Watermeier and continued to complain of low back pain. In November 1999, Dr. Watermeier recommended an anterior lumbar fusion. Before undergoing the lumbar fusion, Ms. Dixon was referred by her attorney to be seen on a one-time basis by two other specialists, Dr. Robert Mimeles, an orthopedic surgeon, and Dr. *483 John Schuhmacher, a neurosurgeon, apparently to obtain other opinions regarding the necessity for the recommended back surgery.
On December 6, 1999, Dr. Mimeles saw Ms. Dixon; at that time she was using a quad cane to assist her in walking. Based on his examination and review of certain of her medical records, Dr. Mimeles issued a report disagreeing with Dr. Watermeier's recommendation of an anterior inner body fusion. Dr. Mimeles indicated that before performing back surgery he would perform a myelogram/CT Scan combination to outline the nerve roots. He further indicated that if further testing established that she had nerve root irritation, he would recommend a conventional lumbar laminectomy with a decompression of the nerve roots posteriorly, not anteriorily as Dr. Watermeier recommended. When questioned at trial by Ms. Dixon's attorney as to whether he would relate her current back pain to the October 7th accident, Dr. Mimeles replied:
Why isn't it the degenerative arthritis in her back at the joints? Well, you can't cut out arthritis. I'm not saying it's any of that. But when you go through any surgery when there's degenerative conditions, I mean, there's part and parcel of things in there that you can't cure with surgery, which is why, when Dr. Schumacher [sic] wrote his letter, he really didn't recommend back surgery. And until I saw something more objective or tangible to hang my hat on, I wouldn't have either.
On January 3, 2000, Dr. Schuhmacher saw Ms. Dixon at the request of her attorney.[5] In his report, he noted that Dr. Watermeier's records indicated Ms. Dixon's diagnosis was post-laminectomy syndrome and muscular injury. He also noted that Ms. Dixon told him that her neck pain decreased following her three-level fusion but that she still had "noises, crepitations" in her neck, pain in her low back and left leg, and that she occasionally falls. Based on his examination, Dr. Schuhmacher indicated that Ms. Dixon was in "no acute distress." As Dr. Mimeles testified, Dr. Schuhmacher indicated in his report that he disagreed with Dr. Watermeier's recommendation that Ms. Dixon have lumbar surgery. Specifically, Dr. Schuhmacher's report concluded with the following recommendation for treatment:
I would treat this lady with weight loss, back exercises, epidural steroid injections and NSAID's. She more than likely has degenerative lumbar spine disease which is aggravated by the reported motor vehicle accident. However, her back pain is rather mild and she is in a sedentary occupation. I would not recommend any surgical intervention unless her pain became totally incapacitating. Lumbar Spine surgery with fusion whether done anteriorly or posteriorly *484 will require a prolonged use of a brace and prolonged recovery. I doubt that she would be significantly improved with such surgery. I think she should learn to live with her symptoms and control them using OTC medications, back exercises, weight loss and proper use of the back.
Despite both Dr. Mimeles' and Dr. Schuhmacher's disagreement with the recommendation that Ms. Dixon have an anterior lumbar fusion surgery, Dr. Watermeier performed that surgery on October 2000.[6] At the time of the December 2001 trial, Ms. Dixon was still under Dr. Watermeier's care. At trial, Dr. Watermier opined that Ms. Dixon's anatomical impairment for the neck was twenty to thirty percent as to the body as a whole; he gave the same estimate for her low back impairment.

DISCUSSION
The central issue presented in this appeal is whether the October 7, 1998 accident caused Ms. Dixon's neck and back injuries, the extent of those injuries, the necessity of the surgical treatment for those injuries, and the adequacy of the quantum of general damages awarded.
A plaintiff in a tort case has the burden of proving by a preponderance of the evidence that the accident more probably than not caused the claimed disabling condition. Jones v. Peyton Place, Inc., 95-0574, p. 12 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 763. This burden is satisfied if medical evidence is presented establishing that it is more probable than not that the claimed condition was caused by the accident. 95-0574 at p. 13, 675 So.2d at 763.
In meeting this burden, a plaintiff may be aided by a presumption of causation "if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition." Id. (citing Housley v. Cerise, 579 So.2d 973, 980 (La.1991)). This so-called Housley presumption, however, is not absolute; the defendant may rebut it by showing that some other particular incident could have caused the disabling condition. 19 Frank L. Maraist, Louisiana Civil Law Treatise: Evidence and Proof, § 4.3 (2001 Supp.)(citing Simon v. United States, 51 F.Supp.2d 739 (W.D.La.1999)). The Simon court explained "the importance of credibility and stated that the finder-of-fact is entitled to stray from the presumption." 51 F.Supp.2d at 746 (citing Basco v. Natchitoches Parish Sheriff's Department, 586 So.2d 733, 734 (La.App. 3 Cir.1991)).
Credibility determinations, including evaluating and resolving conflicting testimony, are factual findings governed by the well-settled manifest error standard of review. Simply stated, "the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
When the trier of fact (in this case, the jury) has made a general damage *485 award and the plaintiff is contending that award is inadequate, the "abuse of discretion" standard of appellate review applies. That abuse of discretion standard is difficult to express and necessarily is "non-specific." Cone v. National Emergency Services, Inc., 99-0934, p. 8 (La.10/29/99), 747 So.2d 1085, 1089 (citing Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993)). In Youn, supra, the Supreme Court noted that although an articulated basis is required to disturb such awards, little guidance is offered as to what articulation will suffice to justify modifying a generous or a stingy award.
An appellate court's initial inquiry in reviewing a general damage award is whether the particular effects of the particular injuries on the particular plaintiff are such that there has been an abuse of the "much discretion" vested in the trier of fact (judge or jury). Youn, 623 So.2d at 1260.
The rationale behind the application of the "much discretion" standard in review of general damage quantum awards is that "awards of general damages, at least as to the amount awarded for injuries proved to have been caused by the tort, cannot be calculated with mathematical certainty." Guillory v. Insurance Co. of North America, 96-1084, p. 1 (La.4/8/97), 692 So.2d 1029, 1036 (Lemmon, J., concurring)(citing Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968)). For that reason, general damage awards are reviewed under the "much discretion" standard of La. Civ.Code art.1999. Id.[7]
Given that "[r]easonable persons frequently disagree about the measure of general damages in a particular case," a general damage award may be disturbed on appeal only when "the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." Youn, 623 So.2d at 1261. The jurisprudential theme that has emerged is that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Id.
An interplay often arises between the manifest error and the abuse of discretion standards of review. Guillory, 96-1084 at p. 1, n. 1, 692 So.2d at 1036 (Lemmon, J., concurring). Explaining that interplay, former Justice Lemmon aptly stated:
The "much discretion" standard applies to the amount of the award of general damages. But there are often factual issues in a review of an award of general damages, such as whether a certain condition was caused by the tort. Of course, most issues decided by courts are mixed fact-law questions, and the fact determinations are reviewed under the manifest error standard.
Id. With those principles in mind, we separately address each of the errors assigned by Ms. Dixon.

NECK INJURY
Ms. Dixon contends that the amount of general damages the jury awarded for her neck injury and the resulting cervical fusion was inadequate and that the trial judge had a duty to remedy said error. In so framing the issue as confined to quantum, Ms. Dixon assumes that as to the *486 extent of her neck injury causation is not at issue. Indeed, she assumes from the jury's finding that her neck injury was caused by the October 7th accident combined with the jury's substantial award for lost wages and impairment of earning capacity can be extrapolated a factual finding that her triple level cervical fusion was caused by the accident. Contrary to her assumption, the jury's finding that her neck injury was caused by the accident cannot be so construed. Rather, as Defendants argue, the jury's award of only $40,000 general damages coupled with its award of nothing for mental anguish-a separate line on the jury's interrogatories-clearly indicates that the jury did not agree with Ms. Dixon's argument that the accident caused all of her neck injuries and thus necessitated a triple level fusion.
Defendants argued at trial, and apparently persuaded the jury, that the accident only partially caused Ms. Dixon's neck injury. As Defendants suggest, the jury's general damage awards, taken together, suggest that it found the accident only caused a single level neck injury at the C6-7 level. Indeed, the jury apparently adopted defense counsel's suggestion in closing argument that an appropriate award for such a one-level neck injury would be between $40,000 to $50,000. It follows then that the next issue we must address is whether that factual finding was manifestly erroneous.
The primary proof on the issue of causation of Ms. Dixon's neck injuries that was presented at trial was the testimony of the three physicians: Dr. Watermeier, Dr. Mimeles, and Dr. Schuhmacher.[8]
Dr. Watermeier, her treating physician, acknowledged that the October 27, 1998 EMG showed no abnormality of the muscle or the nerves of the cervical spine and was completely normal. Interpreting the cervical MRI done that same day, he opined that it showed spondylosis, which he defined as a fancy term for degenerative joint disease or arthritis, and spurring or bone growth. These conditions, he noted, were part of a degenerative disease and thus took years to develop. Explaining why he nonetheless performed a triple level cervical fusion, Dr. Watermeier replied:
[O]ne level had an obvious herniation and the other two levels had some degeneration. And they appeared to be abnormal and would cause problems if we didn't fix them. So, we fix everything at one time, so that she wouldn't have to have any more surgery. I elected to fix all the bad disc at one operation.
Dr. Mimeles interpreted the October 27th cervical MRI as showing "a herniated disc at C6-7 with a bulge slightly eccentric to the right causing some compression on the canal and into the right neural foramen. There were minimal bulges at 4-5 and 5-6 with no compression of any of the neural elements." Dr. Mimeles testified that he did not think Ms. Dixon needed a three-level anterior cervical fusion because she only had a one-level, C6-7, herniated disc. Dr. Mimeles further testified that he would have performed additional diagnostic testing before operating on Ms. Dixon.
Dr. Schuhmacher interpreted the October 27th cervical MRI as showing old degenerative *487 changes with osteophytes (i.e., bony growths) and a disc bulge at C6-7. Dr. Schuhmacher commented that he was not impressed with the C4-5 and C5-6 levels, yet he expressly declined to comment on her need for the neck surgery given that when he saw her she had already had neck surgery.
In sum, all three doctors who testified at trial agreed that the October 27th cervical MRI did not reveal any disc bulges at C4-5 or C5-6; rather, the only level noted to have a bulge was the C6-7. The other two levels on which Dr. Watermeier operated, C4-5 and C5-6, had only degenerative disease. The medical evidence thus clearly supports a finding of a one level neck injury.
The jurisprudence recognizes that an accident can be only a partial cause of a certain injury. VaSalle v. Wal-Mart Stores, Inc., 2001-462 (La.11/28/01), 801 So.2d 331 (reversing the grant of JNOV and reinstating jury's $25,000 general damage award to plaintiff who claimed low back injury allegedly necessitating two-level fusion). Applying the language of the Court in VaSalle, to Ms. Dixon, we find "it is apparent the jury believed Ms. [Dixon] sustained some damages as a result of the [October 7th] accident. However, the jury's awards indicate it is possible the jury found [Defendants were] not the sole cause of Ms. [Dixon's neck] problems and resultant medical bills." 2001-462 at p. 17, 801 So.2d at 341-42. Given that the medical evidence in the record supports the jury's factual finding that the accident was not the sole cause of Ms. Dixon's neck injuries, we cannot say that the jury manifestly erred.
Next, we return to Ms. Dixon's argument that the award of $40,000 in general damages to her for a triple level anterior cervical fusion was woefully inadequate and that the trial court's failure to raise this award was error. Ms. Dixon cites Jackson v. CSX Transportation, Inc., 97-0109 (La.App. 4 Cir. 12/23/97), 712 So.2d 514 for the proposition that the minimum award for a plaintiff who had undergone a cervical fusion is $125,000. Given that Jackson involved a single level fusion and this case involved a triple level fusion, she urges a greater sum is warranted for her claim.
Defendants counter that there is no black letter law or scientific or mathematically exact formula for calculating an appropriate general damage award for certain types of injuries or generic surgical procedures. They contend that Ms. Dixon's argument that the jurisprudence establishes some "lowest reasonable amount" for a cervical fusion that the jury is bound to award is contrary to the Louisiana Supreme Court's holding in Youn, supra.
In Youn, the Supreme Court reiterated its disapproval of an appellate court "simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff" and also reiterated its disapproval of "the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case." Id. Indeed the settled jurisprudential rule is that resort to prior awards is only appropriate after an appellate court has concluded that an "abuse of discretion" has occurred. Cone, 99-0934 at p. 8, 747 So.2d at 1089.
In determining whether an "abuse of discretion" has occurred, the Youn court notes that "[e]ach case is different, and the adequacy or inadequacy of *488 the award should be determined by the facts or circumstances particular to the case under consideration." Id. Our inquiry therefore is a narrow one: whether the particular effects of the particular injuries on the particular plaintiff are such that there has been an abuse of the much discretion vested in the trier of fact. Youn, 623 So.2d at 1260-61. Considering the limited extent to which the jury found Ms. Dixon's neck injury was caused by the accident in question and the impact of the effect of that injury on Ms. Dixon, we are unable to say that the $40,000 general damage award is abusively low.
In sum, we hold that the jury's finding that the neck injury was only partially caused by this accident was not manifestly erroneous and its general damage award was not an abuse of discretion.

BACK INJURY
Ms. Dixon's second assignment of error is that the jury erred in failing to relate her aggravation of her prior back injury to this accident. She contends that the Housley presumption applies and dictates that we find the jury was manifestly erroneous in failing to find causation for that injury.
We first address Ms. Dixon's contention that the adverse presumption for failing to call an available witness should likewise apply given Defendants' failure to call as a witness the doctor they consulted, Dr. Robert Steiner. Defendants counter that Ms. Dixon's reliance on this presumption is both procedurally and substantively misplaced. Procedurally, she failed to preserve this issue as this presumption can only be invoked by requesting an appropriate jury instruction and Ms. Dixon's failure to so request bars her arguing this issue. Substantively, Defendants argue that Dr. Steiner was equally available to Ms. Dixon and could have been called as a witness by her. Regardless, Defendants argue that Dr. Steiner's testimony would have been cumulative. We recently outlined the current status of the "uncalled witness" rule in Taylor v. Entergy Corp., XXXX-XXXX (La.App. 4 Cir. 4/17/02), 816 So.2d 933, stating: it is "an adverse presumption that arises when `a party has the power to produce witnesses whose testimony would elucidate the transaction or occurrence' and fails to call such witnesses." XXXX-XXXX at pp. 14-15, 816 So.2d at 941. We also recently held that the adverse presumption is inapplicable when the witness is equally available to both parties. Bienvenu v. Allstate Insurance Co., 2001-2248, p. 10 (La.App. 4 Cir. 5/8/02), 819 So.2d 1077, 1082-83; See also Hernandez v. Schwegmann Giant Supermarkets, 464 So.2d 902, 907 (La.App. 4 Cir.1985). Such is the case here. The adverse presumption does not apply given the lack of proof that Dr. Steiner could not have been called by Ms. Dixon. As an aside, we note that even if Defendants had called Dr. Steiner as a witness, Ms. Dixon surely would have invoked the presumption in favor of the treating physician.
Ms. Dixon enumerates the following evidence that supports her argument that her back injury is causally related to this accident:
 All three testifying doctors agreed that if Ms. Dixon was asymptomatic when the accident occurred that they would relate these back problems to this accident.
 All three testifying doctors agreed that this accident aggravated a pre-existing condition in her back.
 Absence of any evidence or testimony of any medical treatment from the time of her last epidural injection on August 7, 1995 until this accident on October 7, 1998.

*489  Trip sheets kept in the course of her driving her cab showing the long hours that she was working at the time that she was injured and showed her potential to do heavy physical labor prior to October 7, 1998.
 The testimony of a fact witness, Mario Greco, who was Ms. Dixon's United Cab supervisor, that she was in good physical health at the time of the accident and that he had no problems with her as a cab driver.
 The testimony of another fact witness, Tyrone Faust, who was a friend of the family that allowed Ms. Dixon to live in his apartment overlooking his used car lot for several years between 1993 and 1997, that she washed cars, painted an apartment, took care of his used car lot before this accident and never complained of any back problems to him during that period of time.
Given Defendants' failure to present any rebuttal evidence, Ms. Dixon argues that Housley applies and dictates a finding that October 7th accident caused the aggravation of her prior back injuries.
The trial court instructed the jury not only on the Housley presumption, but also on an exception to the presumption. Specifically, the trial court instructed that the presumption does not apply if the plaintiff's pre-accident and post-accident conditions are similar or identical. The jury heard medical evidence indicating that the exception applies here. Both Dr. Watermeier, Ms. Dixon's treating physician, and Dr. Mimeles opined that Ms. Dixon's 1995 MRI of her back from Charity was identical to the 1998 MRI of her back taken twenty days after the accident.
As noted in Simon, supra, the Housley presumption is not absolute. Credibility is a determining factor in its application. The jury was advised by the trial court of the presumption and the exception thereto. The Defendants apparently convinced the jury that the exception rather than the presumption applied to Ms. Dixon's back injury.
The facts cited by Defendants in support of the claim that Ms. Dixon lacked credibility are as follows:
 prior back injuries and 1993 treatment for low back at Charity;
 lack of employment from 1993 until April 1998 due to back pain;
 sworn disability application claiming total disability since 1993;
 incomplete medical histories given to physicians;
 conflicting testimony regarding prescription drug use or abuse; and
 minor nature of auto accident.
We find these factors support the jury's finding of no causation. Although Ms. Dixon acknowledged that she had a prior back injury, her story was that her prior back problem was entirely resolved in August 7, 1995 after she had an epidural injection at Charity. She thus claims that she was asymptomatic from August 7, 1995 to October 7, 1998. She, however, testified inconsistently at trial that she was unemployed from 1993 to 1998 due to back pain.
Another inconsistency Defendants established was that in June 1999 Ms. Dixon applied for disability benefits, making a sworn statement that her disability began on January 1, 1993. Attempting to explain away the inconsistency between that sworn statement and her testimony that she was asymptomatic from 1995 until 1998, Ms. Dixon testified that the reason she stated her disability began in 1993 was because that was when she started treatment at Charity for her back pain. Again, she articulated the same story that her back pain was totally resolved on August 7, 1995 and did not reappear until the October 7, *490 1998 accident. As Defendants emphasized, however, she failed to state in her disability application that the disability stopped in 1995 and resumed in 1998. As Defendants put it, she could not be disabled twice.
At trial, Ms. Dixon also attempted to establish that she was asymptomatic by focusing on her ability to drive a taxicab full timeseven days a week, twelve hours a dayfor the six months immediately before the accident. In support, she introduced the testimony of two lay witnesses, Mr. Greco and Mr. Faust, and her cab trip sheets. She also introduced the testimony of her treating physician, Dr. Watermeier, that following the accident she was unable to drive a cab.[9] As Defendants argue, Ms. Dixon's argument overlooks the fact that before her six-month stint as a cab driver she had a spotty work record. She worked as a pipe fitter's helper from 1989 to 1992, when she was laid off (which coincided with the commencement of her back pain). And, she had no real job from 1992 until April 1998 when she began driving a cab (during part of which time she lived in the apartment overlooking Mr. Faust's used car lot).
Yet another inconsistency that Defendants established at trial is that Ms. Dixon gave incomplete medical histories to both Dr. Watermeier and Dr. Mimeles. Although she told Dr. Watermeier about the 1989 fall down stairs and the 1995 Charity epidural, she failed to tell him about the following:
 1984 motor vehicle accident following which she had a neck x-ray;
 1992 injury as a pipe fitter's helper, which she related to the doctor whom she saw in 1999 in connection with her disability application;
 1993 spontaneous onset of injury to her back, which she related to Dr. Mimeles;
 1994 CT scan at Charity Hospital; and
 1995 low back injury that occurred when she was working as a pipe fitter's helper, which she related to Dr. Schuhmacher.
Likewise, Dr. Mimeles testified that "by history [he] did not get all the preexisting problems, if they did exist."
In response, Ms. Dixon notes her apparent agreement with Dr. Schuhmacher's characterization of her as a "reluctant historian," i.e., an individual who "had difficulty keeping dates and times and events together." She stressed that none of the physicians questioned her veracity. In support, she quoted Dr. Watermeier's testimony that he believed her complaints were legitimate; particularly, he testified that:
[A]ll of her symptoms were consistent. All of her findings on her tests were consistent with her symptoms. So, everything gelled together. So, I felt it was pretty easy to see that she had symptomatic discs in both her neck and her low back.
She further emphasizes that even when confronted with all the above events that she supposedly failed to tell him, Dr. Watermeier stood by his opinion that the October 7th auto accident aggravated her pre-existing back problem. Dr. Watermeier, however, acknowledged the importance of obtaining an accurate history and acknowledged that his opinion regarding causation of her back problem was based on Ms. Dixon's subjective complaints. In this regard, we repeat Dr. Mimeles' statement *491 when asked if he would related her continuing back pain to the October 7th accident that "until [he] saw something more objective or tangible to hang my hat on, [he] wouldn't have [recommended back surgery]."
Yet still another inconsistency that Defendants established is Ms. Dixon's apparent prescription drug abuse. Defendants established that in a one-month period she filled multiple prescriptions at multiple drug stores, totaling 240 pain pills and 120 sleeping pills. Defendants emphasize Dr. Mimeles' testimony that no one needs that much medication and that this was "abuse." Although Ms. Dixon testified she told Dr. Watermeier that she was taking more medication than he had prescribed and that he responded by decreasing her dosage, Dr. Watermeier contradicted her testimony. He testified that she neither told him that, nor did he alter her dosages.
A final inconsistency that Defendants established is the apparent disparity between the minor nature of the accident and the major nature of the injuries she seeks to relate to it. The minor nature of the accident was acknowledged by Ms. Dixon's actions and words. According to Dr. Watermeier, she told him that the October 7th accident was "a minor event and she was wearing her seat belt." Ms. Dixon's actions likewise indicated this was a nonevent. She exited her vehicle without any difficulty. In response to their questions, she told both Mr. Boyles and Mr. Adolph that she was not injured. She failed to request medical treatment. She failed to request that the police be called. She resumed work, picking up a fare and bringing them to the French Quarter. She obtained an attorney on the day of the accident. And, on referral from her attorney, she first sought medical treatment five days after the accident. See Simon, 51 F.Supp.2d at 750 (finding a plaintiff's similar post-accident actions indicative of a minor mishap). Although Ms. Dixon argues that the fact this was a minor accident is not a valid consideration, the trial court correctly instructed the jury consistent with the current jurisprudence rule that "the minimal or minor nature of an automobile accident is a fact which may be considered by the [fact-finder]." Simon, 51 F.Supp.2d at 747 (citing Fletcher v. Langley, 93-624, p. 4 (La.App. 3 Cir. 2/2/94), 631 So.2d 693, 695)) and collecting cases).
When, as here, "there was a conflict in the evidence on several key points" and "the jury made evaluations of credibility and inferences of fact which were reasonably based on the record as a whole," there is no manifest error. Mann v. Zurich Insurance Co., 97-429, p. 11 (La.App. 5 Cir. 10/28/97), 702 So.2d 960, 964. We thus conclude that the jury's finding that Ms. Dixon's back injuries were not caused by the October 7th accident was not manifestly erroneous.

DECREE
For the foregoing reasons, we affirm the trial court's judgment.
AFFIRMED.
NOTES
[1] This award obviously includes the medical expenses for the triple cervical fusion. As a result, Ms. Dixon's reliance on the jurisprudence holding that a tortfeasor is responsible for unnecessary medical treatment absent bad faith on the part of the tort victim is misplaced. See Use v. Use, 94-0972 (La.App. 1 Cir. 4/7/95), 654 So.2d 1355; Hillebrandt v. Holsum Bakeries, Inc., 267 So.2d 608 (La. App. 4 Cir.1972). Ms. Dixon has already recovered the medical expenses for the neck surgery, making that issue moot.
[2] An obvious typographical error appears in the trial court's judgment. Although the jury awarded $75,000 for impairment of earning capacity, the judgment states that award as $70,000. That error, however, is not raised by either party. Moreover, according to the Defendants' brief, Ms. Dixon has already been paid in full $239,817.94, which is the full amount of the jury award plus interest. Apparently that amount includes the $75,000 amount.
[3] Mr. Ruffino is not a party to this suit, and property damages are not directly at issue.
[4] Ms. Dixon contends the cab had additional damages not shown in the pictures. At trial she produced an estimate of approximately $1,000 in damages to the taxicab; however, a copy of that estimate is not in the record on appeal.
[5] Although Ms. Dixon testified that Dr. Mimeles referred her to Dr. Schuhmacher, that referral was requested by her attorney. At trial, Dr. Mimeles acknowledged revising his initial report at the request of Ms. Dixon's attorney to change the concluding sentence. Dr. Mimeles concluded his initial report with the statement that "[i]f this does indeed confirm the MRI then I would proceed with the indicated surgery if this patient's pain continues to warrant this." At Ms. Dixon's attorney's request, he revised that sentence to read: "[s]ince I'm at odds with Dr. Watermeier insofar as the work up and what type of surgery this patient may need, I would like to get a second opinion and I would recommend Dr. John Schuhmacher for a second opinion to see if he concurs with this thinking." Dr. Mimeles stressed that he did not change anything else in his report and that he only agreed to this change because he had no problems with recommending Ms. Dixon see Dr. Schuhmacher, a neurosurgeon with whom he had a longstanding relationship, for another opinion.
[6] As discussed in more detail elsewhere, Dr. Mimeles and Schuhmacher also voiced some opinion regarding Ms. Dixon's neck injuries, albeit based solely on reviewing her medical records in general and an October 27, 1998 MRI in particular.
[7] Civil Code Article 1999 reads: "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." La. C.C. art.1999; see also La. C.C. art. 2324.1 (providing "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury").
[8] At trial, Defendants also introduced into evidence a report of a x-ray that was taken of Ms. Dixon's neck following a 1984 motor vehicle accident in which she sustained a head injury. Although Ms. Dixon denied sustaining any neck injury in that accident, that x-ray report indicated a possible neck injury. Ms. Dixon responded with evidence that although she filed a lawsuit seeking personal injuries arising out of that 1984 accident, she did not allege any injury to her neck, nor did she ever seek treatment for any neck injury.
[9] At trial, Dr. Watermeier opined that Ms. Dixon was capable of performing a sedentary or minimum wage job.