| JILL STAUDER AND | * | NO. 2022-CA-0593 |
| SHELLEY STAUDER, | | |
| INDIVIDUALLY AND ON | * | |
| BEHALF OF THE DECEASED, | | COURT OF APPEAL |
| DAVID STAUDER, JR. | * | |
| | | FOURTH CIRCUIT |
| VERSUS | * | |
| | | STATE OF LOUISIANA |
| SHELL OIL COMPANY, | * * * * * * * | |
| AVONDALE SHIPYARDS, | | |
| INC., ANCO INSULATIONS, | | |
| INC., LOU-CON, INC., THE | | |
| MCCARTY CORPORATION | | |
| AND TAYLOR-SEIDENBACH, | | |
| INC. | | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2016-02190, DIVISION "F-14"
Honorable Jennifer M Medley,
* * * * * *
**Judge Rachael D. Johnson**
* * * * * *
(Court composed of Chief Judge Terri F. Love, Judge Dale N. Atkins, Judge
Rachael D. Johnson)

 **ATKINS, J., CONCURS AND ASSIGNS REASONS.**

Calvin Clifford Fayard, Jr.
D. Blayne Honeycutt
FAYARD ATTORNEY AT LAW
519 Florida Avenue Southwest
Denham Springs, LA 70726

Lewis Owens Unglesby
Lance C. Unglesby
Jamie F. Gontarek
Adrian M. Simm, Jr.
UNGLESBY LAW FIRM
246 Napoleon Street
Baton Rouge, LA 70802

Lindsey A. Cheek
THE CHEEK LAW FIRM
650 Poydras Street
Suite 2310
New Orleans, LA 70130

COUNSEL FOR PLAINTIFF/APPELLEE

McGready Lewis Richeson
Ernest George Foundas
Milele N. St. Julien
David M. Stein
Francis Xavier deBlanc, III
PUGH ACCARDO HAAS RADECKER & CAREY, LLC
1100 Poydras Street, Suite 3300
New Orleans, LA 70163

Kelly B. Becker
Erin E. Bambrick
Trinity A. Morale
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139-5099


COUNSEL FOR DEFENDANT/APPELLANT


**AFFIRMED**
**February 15, 2023**

In this mesothelioma case, the Appellant, Union Carbide Corporation ("UCC"), seeks review of the April 14, 2022 district court judgment, awarding the Appellees, sisters Jill and Shelley Stauder ("the Stauders"), each $2,750,000 in wrongful death damages for the death of their father, David Stauder, Jr. UCC additionally seeks review of the district court's award of judicial interest to the Stauders against UCC relating back to the date the Stauders' original petition was filed.

Based upon our review of the facts and applicable law, we affirm the wrongful death awards and the award of pre-judgment interest against UCC.

## Facts and Procedural History

Mr. Stauder was a pipefitter, who worked for several employers at various locations, spanning from the 1960s to the 1980s. Throughout his career, Mr. Stauder worked with numerous asbestos products. In his seventies, Mr. Stauder

was diagnosed with mesothelioma and within two months of his diagnosis, he passed away on April 30, 2015. The Stauders are his two surviving children.

In 2016, the Stauders brought suit for a survival action and wrongful death damages against their father's past employers, Shell Oil Co. and Avondale Shipyards, Inc., as well as four asbestos manufacturers: Anco Insolations, Inc., Lou-con, Inc., the McCarty Corporation and Taylor Seidenbach, Inc. The Stauders alleged their father was exposed to asbestos and asbestos containing materials during his employment that began in the 1960s, resulting in him contracting and dying from mesothelioma. Subsequently, in their Sixth Supplemental and Amending Petition, filed in July of 2018, the Stauders named UCC as a defendant, alleging their father was exposed to asbestos while working at one of UCC's Louisiana facilities.

A multi-day trial was held in December 2021. At that time, UCC was the sole remaining defendant. The jury rendered its verdict on December 17, 2021, finding that seven defendants, including UCC, were negligent and strictly liable for causing Mr. Stauder to contract mesothelioma. The jury assigned 20% fault to UCC. The jury awarded survival damages in the amount of $4,851,034.31. The Stauders were each awarded $2,751,793 in wrongful death damages. The district court rendered judgment on April 14, 2022, in conformity with the jury verdict. The district court further awarded the Stauders judicial interest against UCC from the date the original petition was filed in 2016, and set forth that UCC is responsible for paying the Stauders $693,004.90 of the survival damages. UCC's post-judgment motions, including its motion for new trial on judicial interest and its "motion for new trial or in the alternative JNOV or in the alternative remittitur exhibits," were denied.

2

This timely appeal followed. UCC raises three assignments of error: 1.) the jury manifestly erred in awarding $2.75 million in wrongful death damages to each of the Stauders; 2.) the district court legally erred in denying UCC's Motion for New Trial, or, in the Alternative, JNOV, or, in the Alternative, Remittitur as to quantum; and 3.) the district court legally erred in allowing judicial interest to relate back to the date that the lawsuit was filed when UCC was not added as a defendant until two years later and where the record does not establish that Mr. Stauder's injuries were caused by a "single tortious occurrence."

**Wrongful Death Damages**

UCC avers that the jury erred in awarding each of the Stauders $2.75 million in wrongful death damages, which it alleges far exceeds any jurisprudential award for damages to adult children in this Circuit. UCC asserts that only generalized testimony was offered in support of the Stauders' claims and this is deficient to support the large award of the jury. Thus, UCC maintains the district court erred in issuing its judgment in accordance with this extreme verdict, and subsequently erred in failing to grant UCC's motion for new trial, JNOV, or in the alternative, remittitur as to quantum. The jury's award to the Stauders, UCC argues, is wholly inconsistent with the record and grossly excessive. Moreover, UCC further contends that the jury erred in awarding the Stauders the same amount in wrongful death damages because the testimony adduced at trial did not reflect that the sisters were equally impacted.

"Damages for wrongful death are intended to compensate the victim's beneficiaries for their loss, following the victim's death." *Turner v. Lyons*, 03-0186, p. 11 (La. App. 4 Cir. 1/28/04), 867 So.2d 13, 21; La. Civ. Code art. 2324.1. "Elements of damages for wrongful death include loss of love and affection, loss

3

of services, loss of support, medical expenses and funeral expenses." *Id*., 03-0186, pp. 11-12, 867 So.2d at 21. The plaintiff has the burden of proving definite loss. *Id*., 03-0186, p. 13, 867 So.2d at 22 (citing *Quinn v. Wal–Mart Stores, Inc*., 34,280 (La.App. 2 Cir. 12/6/00), 774 So.2d 1093).

The determination of the amount of damages is factual determination for the jury and is "entitled to great deference on review." *Norfleet v. Lifeguard Transp. Serv., Inc*., 05-0501, p. 10 (La.App. 4 Cir. 5/17/06), 934 So.2d 846, 855 (quoting La. Civ. Code art. 2324.1). [Internal citations omitted]. The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. *Youn v. Mar. Overseas Corp*., 623 So.2d 1257, 1261 (La. 1993).

Moreover, "[r]easonable persons frequently disagree about the measure of general damages in a particular case." *Id.* "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Id.* "Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration." *Id.*, 623 So.2d at 1260; see also *Turner,* 03-0186, p. 11, 867 So.2d at 21-22 (citing *Coco v. Winston Industries, Incorporated,* 341 So.2d 332 (La.1977)).

In *Dixon v. Travelers Ins. Co.,* 02-1364, pp. 14-15 (La.App. 4 Cir. 4/2/03), 842 So.2d 478, this Court further explained *Youn*'s holding that it is only after a determination has been made that the trier of fact abused its discretion that it becomes appropriate for the appellate court to review the an award of damages in comparison with prior awards:

In *Youn,* the Supreme Court reiterated its disapproval of an appellate court "simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff" and also reiterated its disapproval of "the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case." *Id.* Indeed the settled jurisprudential rule is that resort to prior awards is only appropriate after an appellate court has concluded that an "abuse of discretion" has occurred. *Cone,* 99-0934 at p. 8, 747 So.2d at 1089.[1]

In determining whether an "abuse of discretion" has occurred, the *Youn* court notes that "[e]ach case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration." *Id.* Our inquiry therefore is a narrow one: whether the particular effects of the particular injuries on the particular plaintiff are such that there has been an abuse of the much discretion vested in the trier of fact. *Youn,* 623 So.2d at 1260-61.

*Dixon,* 02-1364, pp. 14-15, 842 So.2d at 487-88.

UCC principally relies on *Lege v. Union Carbide Corporation*, 20-252 (La.App. 4 Cir. 4/1/21), 2021 WL 1227137, *as clarified on reh'g*, 20-252 (La.App. 4 Cir. 5/12/21), 2021 WL 1917784,[2] in support of its argument that the Stauders' wrongful death awards are too high, particularly for Shelley because she did not testify.

In *Lege*, a plant owner in a mesothelioma wrongful death and survival action, sought review of the district court's judgment finding it primarily at fault for the plaintiff's death. *Id.*, 20-252, p. 1, 2021 WL 1227137, p. 1. Additionally, the plant owner sought review of the district court's award of damages to the

---

[1] *Cone v. National Emergency Services, Inc.*, 99-0934 (La.10/29/99), 747 So.2d 1085.
[2] We note *Lege*, while published, is not a final opinion and is subject to revision or withdrawal.

plaintiff for pain and suffering and wrongful death damages to his wife as well as his four children, who were awarded $500,000 each. *Id.* The plant owner asserted the $500,000 wrongful death awards were excessive because only two of plaintiff's four children testified and there was a lack of evidence to support the plaintiff's relationship to the non-testifying children. *Id.*, 20-252, pp. 14-15, 2021 WL 1227137, pp. 30-32.

The Court recognized that while the plaintiff was loved by his family, it noted that it is a "court of record." *Id.*, 20-252, p. 13, 2021 WL 1227137, p. 27 (citing *Turner v. Lyons*, 03-0186, p. 14, (La.App. 4 Cir. 1/28/04) 867 So.2d 13, 22). The Court in reviewing *Turner's* applicable holdings, noted that "[b]ecause loss of consortium is a personal loss, each child should be given a chance to convey the impact the injury or death had on their respective lives." *Id.*, 20-252, p. 14, 2021 WL 1227137, pp. 30-31 (quoting *Turner*, 03-0186, p. 17, 867 So.2d at 25).[3]

The Court affirmed the wrongful death awards for the two children who testified, finding "their testimony was not general; they each articulated a specific, personal loss." *Id.*, 20-252, p. 14, 2021 WL 1227137, p. 30. The Court determined that there was no abuse of discretion where one of Mr. Lege's sons "testified that he lost someone he considered a best friend," and his daughter "wished Mr. Lege would have lived longer so she could spend more time with him and testified that

---

[3] A "wrongful death action arises at the death of the victim, and compensates the beneficiaries for their injuries that occur at the moment of the victim's death and thereafter," similarly "a loss of consortium action arises at the time an injured party's condition deteriorates to such an extent that his family is actually deprived of his consortium, service, or society and compensates the beneficiaries for their injuries at that moment and thereafter." *Landry v. Avondale Indus., Inc.*, 03-0719, p. 8 (La. 12/3/03), 864 So. 2d 117, 125 [internal citations omitted]. The two claims are similar because they compensate "beneficiaries for their own injuries, separate and distinct from the primary victim's injuries." *McGee v. A C And S, Inc.*, 05-1036, p. 14 (La. 7/10/06), 933 So. 2d 770, 780 (citing *Landry,* 03-0719, p. 10, 864 So.2d at 126).

she lost someone whom she spent time caring for and with whom she spent time socializing." *Id.*

Nevertheless, the *Lege* Court rationalized that the awards to the two non-testifying children were an abuse of discretion. *Id.*, 20-252, pp. 14-15, 2021 WL 1227137, pp. 31-32. The Court reasoned that although the siblings who testified stated they were also testifying on behalf of their non-testifying siblings to avoid taking up too much of the jury's time," they provided only general testimony about the closeness of the family. *Id.* The record was devoid of testimony of the relationship between the plaintiff and the non-testifying children, who were present in court during the trial. *Id.*

Having determined that the jury abused its discretion, the Court then reviewed prior awards to determine the highest point that is reasonably within the jury's discretion based on the record. *See Youn*, 623 So.2d at 1260-61. The Court held that a review of applicable jurisprudence reflected that awards to adult children for the death of an elderly parent ranges from $12,500 to $150,000. The award to the non-testifying children was then reduced to $100,000 each. *Id.*, 20-252, pp. 14-15, 2021 WL 1227137, pp. 31-32.

Considering the standards set forth above, we review this matter under the unique facts presented. We therefore focus our review on the evidence adduced at trial pertaining to the relationship of each of the Stauders to their father.

We note that at the beginning of the trial, counsel for the Stauders explained to the jury that Shelley would not be present at trial because she suffers from a "mental disability" and that there was a doctor's report which explained her absence. The jury was instructed to listen to what witnesses said about Shelley's relationship with her father. Both Jill Stauder and Mr. Stauder's girlfriend, Anna

7

Bordelon, testified about the Stauders' relationship with their father. Ms. Bordelon's testimony expounded on Shelley's relationship with her father, while Jill principally testified about her personal relationship with her father.

Ms. Bordelon, who was in a twenty-six year relationship with Mr. Stauder, testified that the Stauders were both extremely close to their father, including prior to Mr. Stauder's illness. Shelley, Ms. Bordelon related, lived in a separate house on the same property with Ms. Bordelon and Mr. Stauder for approximately five to six years. She further testified that Shelley visited her father daily and would have dinner with him. Ms. Bordelon further explained that it was Shelley who took her father to the emergency room the first time he passed out at home because he was unable to breathe.

Ms. Bordelon further attested to the Stauders being extremely upset when their father was diagnosed with mesothelioma. She testified that while she took care of Mr. Stauder, the Stauders also helped take care of him, including caring for him on the weekends. Ms. Bordelon explained that Shelley was currently still grieving her father and that she did not believe Shelley's emotional state would ever be the same following his passing. She further testified that Jill also took her father's death hard. She related that both sisters were "really close to their dad" and were continuing to have "a very hard time."

Jill testified that she is a registered nurse and at the time of her father's illness and passing she was a traveling nurse. She related that before her father became sick, they spent time together daily and their relationship morphed into more of a friendship. They ate Sunday dinner together every weekend and talked all the time, she explained. According to her testimony, she and her father enjoyed playing and watching golf games, as well as watching Saints games together.

She testified that both she and Shelley lived close to their father and spent a lot of time with him. She related that her father loved his kids. She further explained that she and her father had a stronger bond because of the loss of their brother, who was close to both her and her father.

Jill testified that prior to placing Mr. Stauder in hospice she was taking care of him with the assistance, at times, from Ms. Bordelon and Shelley. She explained that she decided to place him in hospice after he fell and broke some of his ribs. He was in hospice for two weeks before he passed. Jill testified that Shelley was with their father when he passed.

Following Mr. Stauder's death, Jill testified that she later met and married a man from New Zealand, where she eventually relocated. She related being unhappy at her wedding because of the void she felt from her father's absence. She also testified that she daily laments that her two-year old son did not get to meet her father. It was hard to remain in New Orleans after her brother and father's deaths, so she relocated to New Zealand, she explained.

The jury heard testimony about the relationship Mr. Stauder had with each of his daughters, who were both distraught and adversely impacted by their father's illness and death in distinct ways. Although generalized testimony about the mutual love the Stauders and their father shared, specific testimony was offered regarding the unique relationship each daughter had with their father.

For Shelley, who visited and dined with her father daily for six years, her mental health worsened because of her father's passing. Jill, who visited her father often and bonded with him over activities after her brother's death, experiences guilt because Mr. Stauder missed her wedding and meeting his grandson. The record reflects that both sisters loved their father and spent copious amounts of

time with him in good health and in illness. The testimony establishes that each sister has sustained loss of love and affection from their father, who they each still grieve. The jury's verdict evidences they understood Shelley was unable to testify and believed the testimony made on her behalf. The testimony adduced at trial is not generalized in nature and the jury's reliance upon the same was not an abuse of its vast discretion.

In light of the aforementioned testimony, we find UCC's reliance on *Lege* is misplaced. *Lege* is factually distinguishable from the matter *sub judice*. Shelley's inability to testify coupled with the detailed testimony, offered on her behalf, of the bond she shared and lost with her father does not make her comparable to the non-testifying children in *Lege,* who were both capable of testifying *and* present at trial. Furthermore, the only facts set forth about the non-testifying *Lege* adult children's relationship with their father is that he was loved by his family and the family was always together. Regarding Jill, she personally testified[4] about the bond she shared with her father, how they had become friends, and that she laments her father was unable to enjoy the family she now has.

Based upon our review of the testimony and our narrow inquiry into whether the particular effects of the particular injuries on the Stauders are such that there has been an abuse of the much discretion vested in the trier of fact, we find no abuse of discretion in the jurors' award of $2.75 million to each of the Stauders for wrongful death damages. The jury perceived that Jill and Shelley had distinctive relationships with their father, but were equally close to him and were devastated by his passing in their own way. While the wrongful death awards at issue are larger than those in *Lege*, this Court first has to determine the jury abused

---

[4] Jill testified through video from New Zealand.

10

its discretion in awarding this amount before comparing the size of the awards. As discussed above, we find no abuse of discretion. We cannot apply *Lege* as a litmus test for setting the amounts of the respective wrongful death awards of the Stauders, as this belies the *Youn* Court's holding that the unique facts of each case should be considered. This assignment of error is without merit.

We pretermit UCC's assignment of error pertaining to the district court's denial of its motion for new trial, JNOV and remitter because we find the district court did not err in issuing its judgment in accordance with the award of the jury.

**Judicial Interest Award**

In its final assignment of error, UCC asserts the district court committed legal error in ordering that it pay judicial interest from the date the original lawsuit was filed in March 2, 2016, instead of the date when UCC was added as a defendant on July 31, 2018. Relying on *Burton v. Foret*, 498 So.2d 706 (La.1986), UCC maintains that because the Stauders' claim against UCC does not arise out of a "single tortious occurrence" with the six original defendants it should not have to pay judicial interest dating back to the filing of the Stauders' original petition.

In *Burton*, the Supreme Court "held that interest was owed by a solidary tortfeasor named in an amended petition from the date of the original petition in the same state court action." *Nat'l Bldg. & Contracting Co. v. Alerion Bank & Tr. Co.*, 01-2201, p. 6 (La.App. 4 Cir. 10/30/02), 832 So.2d 341, 344. The *Burton* Court explained "[u]nder LSA–R.S. 13:4203, legal interest runs from the date of

11

plaintiff's first judicial claim against all parties responsible for a single tortious

occurrence. LSA–C.C.P. art. 1153." *Burton*, 498 So.2d at 712.[5]

UCC argues that the basis of awarding pre-judgment judicial interest is La.

Code Civ. Proc. art. 1153, which provides "[w]hen the action or defense asserted in

the amended petition or answer arises out of the conduct, transaction, or

occurrence set forth or attempted to be set forth in the original pleading, the

amendment relates back to the date of filing the original pleading." UCC further

relies upon *Ray vs. Alexandria Mall, Through St. Paul Prop. & Liab. Ins.*, 434

So.2d 1083, 1086-87 (La. 1983), wherein the Louisiana Supreme Court set forth

four factors to determine whether relation back applies under art. 1153:

1. The amended claim must arise out of the same transaction or occurrence set forth in the original pleading;

2. The purported substitute defendant must have received notice of the institution of the action such that he will not be prejudiced in maintaining a defense on the merits;

3. The purported substitute defendant must know or should have known that but for a mistake concerning the identity of the proper party defendant, the action would have been brought against him;

4. The purported substitute defendant must not be a wholly new or unrelated defendant, since this would be tantamount to assertion of a new cause of action which would have otherwise prescribed.

---

[5] "Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, "ex delicto", which may be rendered by any of the courts." La. Rev. Stat. 13:4203

UCC avers that this Court should apply the *Ray* factors to the facts of this matter. We decline to apply the *Ray* factors to the matter *sub judice*, where there is no precedent to do so in matters involving prejudgment interest.

UCC fails to provide any caselaw to support its definition of a "single tortious occurrence," and there is a lack of legal authority supporting UCC's interpretation that *Burton* requires both solidary liability and "a single tortious occurrence". Furthermore, the Louisiana Supreme Court clarified its *Burton* holding in *Cole v. Celotex Corp.*, 599 So.2d 1058 (La. 1992).

In *Cole*, three former refinery workers, who were exposed to asbestos, filed suit against several manufacturers of asbestos-containing products as well as the primary liability insurer of some of the refinery executives. *Id.*, 599 So.2d at 1061. At trial, the jurors determined that the insurer and manufacturer-defendants were solidarily liable for plaintiffs' injuries. *Id.* The "district court rendered judgment awarding legal interest on the damages from the date of judicial demand." Thereafter, the Third Circuit amended the judgment on appeal "to clarify that legal interest was to run from the date of judicial demand in the present case in state court." *Id.*, 599 So.2d at 1081.

In a writ application to the Louisiana Supreme Court, the plaintiffs raised several issues, including "whether pre-judgment interest should run from the date plaintiffs filed suit" in state court, as the Third Circuit held, or from the date plaintiffs first filed suit in federal court. Prior to filing suit in state court, the plaintiffs each commenced a separate suit in federal court, joining only the manufacturer-defendants. The insurer was not sued until the plaintiffs filed suit in state court. *Cole*, 599 So.2d at 1081.

While addressing the plaintiffs' argument that the Third Circuit should have held that interest relates back to the judicial demands they made in federal court, the *Cole* Court clarified the Supreme Court's holding in *Burton* means that pre-judgment interest relates back to the date the plaintiff filed suit against the first solidary defendant:

> . . . Our citation to LSA–C.C.P. Art. 1153 in support of this conclusion evidences the limited nature of our holding in *Burton*, supra. **Burton simply stands for the proposition that when an amended petition is filed to add another joint tortfeasor, interest against that tortfeasor runs not from the date of the amendment, but from the date suit was originally commenced in state court.**

*Cole,* 599 So.2d at1081-1082. [Emphasis added].

Considering the Supreme Court's holding in *Cole*, and the absence of jurisprudence supporting UCC's interpretation of a "single tortious occurrence," we affirm the ruling of the district court finding no legal error. This assignment of error is without merit.

### DECREE

For the foregoing reasons, the April 14, 2022 judgment of the district court is affirmed.

**AFFIRMED**